107 So.2d 809 (1959)
Gustave ADAMS and Mrs. Laurencia Pitre Adams,
v.
Veneral DANTIN and Pacific Indemnity Company.
No. 4718.
Court of Appeal of Louisiana, First Circuit.
January 5, 1959.
*810 Adams & Reese, Geo. C. Ehmig, New Orleans, for appellants.
Pugh, Lanier & Pugh, Thibodaux, for appellees.
LOTTINGER, Judge.
This is a suit for damages by the parents of Robert Adams which damages result from the death of their son in an automobile accident. The petitioners are Gustave Adams and Mrs. Laurencia Pitre Adams, the father and mother of the deceased minor. The defendants were originally Veneral Dantin and his insurer, Pacific Indemnity Company. Prior to trial Mr. Dantin died, and the only remaining defendant is Pacific Indemnity Company. This suit was consolidated for trial with another suit entitled "Washington Fire & Marine Insurance Company, Inc. vs. Veneral Dantin, and The Pacific Indemnity Company" which was a suit for property damages resulting from the same accident, the petitioner therein being the collision insurer and subrogee of the petitioner, Gustave Adams, in the present suit. After trial of the matter, the lower court awarded judgment in the present proceeding, for personal injuries, in the amount of $5,000, and in the companion suit a judgment for petitioner was allowed in the amount of $751.52, for property damages. The defendants in each instance have taken appeals.
As the two suits were consolidated for trial below, we will treat both suits in this proceeding, however, a separate judgment will be rendered by this Court in the companion suit. 107 So.2d 814.
The records disclose that the fatal accident occurred on November 22, 1955, within the corporate limits of the town of Golden Meadow, Louisiana. Immediately prior to the accident, petitioners' minor son, Robert Adams, was driving an automobile owned by his father, Gustave Adams, in a northerly direction on Louisiana Highway No. 1 in the town of Golden Meadow, Louisiana. Louisiana Highway No. 1 is a heavily traveled highway running along the west or right descending bank of Bayou Lafourche, and is paved for a width of 18 feet. The weather was dry, the road was straight in the immediate vicinity of the accident, and the time of the accident was approximately 8:30 o'clock p. m.
At about the same time, the minor child of Veneral Dantin, namely, Carbet Dantin, *811 who resided with his father, was also traveling in a northerly direction along Louisiana Highway No. 1. Apparently, young Adams slowed the speed of his automobile and attempted to make a left turn into Dr. Sherman's Clinic, which is situated on the westerly side of Louisiana Highway No. 1. The evidence indicates that young Dantin, who was following young Adams at some distance, was traveling at a very high rate of speed, and that he, upon noticing the attempted left turn by the driver of the Adams vehicle, applied his brakes and skidded for a distance of 120 feet, and then proceeded an additional 10 feet before the point of impact. The impact was between the left front of the Dantin car and the extreme left rear of the Adams car. The right hand skid mark of the Dantin car commenced in its left, or the west, lane of traffic at a distance of 18 inches from the center line of the highway and continued for a distance of 120 feet, terminating in the left, or west, lane at a distance of 6 inches from the center line of the highway.
The record indicates that after the apparently heavy impact, the Dantin vehicle traveled an additional 75 feet and came to rest facing in a northeasterly direction on the eastern shoulder of the highway. The Adams vehicle came to rest in the yard of Dr. Sherman, at a distance of approximately 37 feet from the point of impact.
All of the above evidence was given by Mr. Nolan Plaisance, who was the Town Marshal of the town of Golden Meadow, Louisiana. Although Mr. Plaisance was not an eyewitness to the accident, he did make an official investigation thereof, and arrived on the scene some twenty minutes after the accident. Mr. Plaisance testified that the legal rate of speed within the town of Golden Meadow is 25 miles per hour, and that the accident occurred inside the town of Golden Meadow. He further testified that Louisiana Highway No. 1 is a heavily traveled artery.
This suit is very unique in that Mr. Plaisance was the only witness who testified as to the occurrence of the accident, the only other witness in the case being Dr. Edward G. Rivet who testified as to the injuries sustained by young Adams. The parties stipulated as to the policy of liability insurance written by Pacific Indemnity Company, as well as to the fact that Washington Fire & Marine Insurance Company, Inc. was appearing as a subrogee of Gustave Adams, and they also stipulated as to personal damages for loss of their son sustained by petitioners Gustave Adams and his wife in the amount of $5,000, as well as property damages, if any, to their subrogee in the amount of $751.52.
After taking the testimony of Mr. Plaisance and that of Dr. Rivet, the petitioners rested their case subject to rebuttal. After a conference with the attorneys for the defendants, the defendants rested, without introducing any testimony, and so, of course, the testimony was closed. The defendants now contend that the petitioners have failed to prove their case by a preponderance of the evidence. They base their contention primarily on the fact that the minor driver of the Dantin automobile was in Court, and petitioner failed to call him to the stand, as well as their failure to call to the stand two other young boys who were riding with young Dantin at the time of the accident. Of course, as to young Dantin, he is more or less in a position of adversary and the petitioner cannot be required or expected to call an adverse party as a witness. As to the other two young men, they were riding with young Dantin at the time of the accident, and they must have been friendly with him. So we might assume that they might also be unfriendly witnesses to the petitioners' case. Although it appears that petitioners might have had the right to call young Dantin under cross examination under the provisions of LSA-R.S. 13:3662 et seq., we do not feel that their failure to call or to attempt to call him under cross examination can in any way be held against *812 them. Young Dantin, as well as his two young friends, were in Court, and if the failure to call them is to be held against any one, it should be against defendants.
Another contention made by the defendants in support of their argument that petitioners have failed to prove their case is that upon cross examination Mr. Plaisance was unable to state with exact certainty that the skid marks were made by the Dantin vehicle. Upon direct examination, he testified that the skid marks were made by the Dantin vehicle, however, on cross examination, when asked by the defendant attorneys as to how he knew that they were made by the Dantin vehicle, he was unable to testify with certainty as to the origin of the skid marks. However, the effect of his testimony was that they led to the point of impact, that they were fresh, and we feel that the testimony of Mr. Plaisance in this respect was sufficient to make out a prima facie case. Certainly, if the defendants feel, with justification, that the skid marks were not made by the defendant's vehicle, they could have very easily proved their points because they had three passengers in the vehicle who were present in Court and no reason was given for their failure to call these witnesses for examination. In the opinion of the defense attorneys, they feel that the petitioner had failed to prove his case.
The lower court found that the evidence adduced by petitioner was sufficient to prove a prima facie case against the defendants, based upon the grounds that the accident was caused by the wanton negligence of young Dantin in driving at an extremely high rate of speed. This finding was summarized by the lower court in its memorandum of reasons orally assigned, as follows:
"A review of events immediately preceding the impact deserve consideration. The Dantin car traveled a distance of 120 feet from the beginning to the end of its skid marks, then 10 feet to the point of impact, and then 75 feet to its stopping point, a total distance of 205 feet. A complete picture requires consideration of reaction time, the time from the moment of apprehension of danger to the moment braking becomes effective. Average reaction time is three-fourths of a second, and, in the absence of evidence to the contrary, we shall assume average time. If the Dantin car was traveling at 50 miles per hour (or double the speed limit in Golden Meadow), reaction distance was 55 feet. Thus, at that rate of speed, the Dantin car traveled a distance of 185 feet from the moment of apprehension to the time of impact, and thereafter 75 feet, or a total distance of 260 feet before coming to a stop.
"Acceptable speed charts, including `The Driver's Handbook for Louisiana' issued by the Department of Public Safety, show that a car with good brakes and traveling on a good braking surface at a speed of 50 miles per hour, can be brought to a complete stop in a braking distance of 128 feet, which, with the addition of 55 feet reaction distance, makes a total traveling distance of 183 feet from the point of apprehension.
"In the instant case, the Dantin car traveled 185 feet from the point of apprehension to the point of impact, then crashed heavily into the Adams car, a blow that must necessarily have slowed its speed, and then traveled an additional 75 feet before stopping. These circumstances indicate clearly that the initial speed of the Dantin car was substantially more than 50 miles an hour. While we have no gauge by which to fix its actual speed, it is our view that it could not possibly have been less than 60 miles per hour, or a speed of 88 feet per second. At the latter speed, braking distance is 185 feet and reaction distance is 66 feet, a total stopping distance of 251 feet.
"Let us view the scene in that light. When the Dantin car was 251 feet away from the point of impact, the driver became apprehensive and, after the lapse of reaction time and distance, applied his brakes. *813 The only possible apprehension disclosed by the record was the Adams car beginning a left turn. At that point the paved concrete slab was 18 feet wide, the left half of which was 9 feet wide. If the Adams car had been traveling properly in its own lane, and we so assume in the absence of evidence to the contrary, it was at least 10 feet from the west side of the paved slab; and if we consider the arc a car has to travel to negotiate a left turn to be about double the perpendicular distance, then the distance from the point of beginning of the turn to the edge of the pavement was about 20 feet; and if we allow about 16 feet for the length of the car, that car would travel an approximate distance of 36 feet to get entirely off the highway. If the turning speed were 15 miles per hour, or 22 feet per second, the turn would be made in about 2 seconds. If turning speed were 10 miles an hour or the arc of the turn longer, then the turn would require about 3 seconds to clear the left lane.
"If the Dantin car had been traveling at the lawful speed of 25 miles per hour when the Adams car began its turn, it would have been 7 seconds away and there would have been ample time for a safe turn. What is even more certain, the Dantin car would have had ample time to stop, if that had become necessary, because at 25 miles per hour reaction distance is 28 feet and braking distance 39 feet, or a total stopping distance of 67 feet. But what is even more impressive is that, as heretofore mentioned, the Dantin car could have been brought to a stop if it had been traveling at 50 miles per hour, double the speed limit in Golden Meadow.
"It is our view that the driver of the Adams car acted reasonably in believing he had ample time within which to safely make a left turn in the zone in which he was traveling, and that he would have done so except for the excessive speed of the Dantin car in such a restricted zone. We believe that the Adams driver was reasonably entitled to expect the driver of the approaching Dantin car to respect well established regulations, or at least not to violate them as wantonly and recklessly as was done here, that he was justified in undertaking to make the turn he attempted, and was not negligent in the undertaking. Indeed, if the Adams driver looked before turning, then the Dantin car was considerably further away down the highway at the moment of looking than the estimated distance of 251 feet at the moment of turning, and the crossing must have appeared all the more safe, and would have been safe but for the excessively reckless speed of the Dantin car. One circumstance that impresses us as emphasizing the negligence of Dantin is that within a minimum distance of 251 feet from the reaction point to the point if impact ahead of him, and probably the entire right lane of the highway clear for at least half of the traveling distance, the Dantin car did not move to the right lane, but continued in the left lane and struck the Adams car three feet from the left side of the highway, at which point most of the Adams car had cleared the left lane. It is our view that the proximate cause of the collision was the negligence of the driver of the Dantin car.
"While contributory negligence has been pleaded by the defendants, the jurisprudence is clear that contributory negligence will not be presumed, but must be affirmatively established. It has not been established here.
"Some question was raised as to the sufficiency of the evidence adduced. It is our opinion that the evidence presented by plaintiffs, being uncontradicted, was sufficient to establish a prima facie case."
As to the findings of the lower court in regard to the negligence of young Dantin, we are wholly in accord, and find no error therein.
Another question is raised by the defendants as to any damages for a loss of life of young Adams, they contending that no causal connection was shown so as to connect the death of young Adams *814 with the accident. The evidence shows that, as a result of the accident, young Adams received severe injuries, including a fracture of the left femur, a head injury, a mild concussion, multiple lacerations of the right super orbital region, contusion of the posterior chest wall, abrasions of the left knee, and laceration of the left leg. Several days later, Dr. Rivet concluded that it would be necessary to perform surgery in order to properly set the fractured femur. During the operative procedure, the patient suffered a heart failure, and died on the following day. The cause for death was given by Dr. Rivet as a cardiac arrest with fatal brain damage. During the operation when the Doctor realized that the heart had stopped beating, he performed an incision into the chest wall and massaged the heart. The heart did commence beating again, however, it never did return to normal and his death resulted on the following day. The Doctor testified that it was just a question of a sequence of events which commenced as a result of the automobile accident and terminated in the death of young Adams.
The record indicates that there is no question but that the fractured left femur was a direct result of the accident in question. Surgery was performed to correct this condition which young Adams had sustained in the accident. During the operative procedure one of the complications which unfortunately arise occurred, this being a cardiac arrest, which, before it could be corrected, had produced fatal or irreversible damages in the brain resulting in the death of the young boy. We feel that there is such a sequent of events presented in the testimony of Dr. Rivet which shows a causal connection between the accident and the death of young Robert Adams. None of this testimony of Dr. Rivet has been contradicted, nor have the defendants presented any testimony which is adverse thereto.
We feel, as did the lower court, that the petitioners in both of these suits have made out a prima facie case, and, for the reasons hereinabove assigned, the judgment of the lower court in both suits will be affirmed. All costs of this appeal is to be paid by defendant.
Judgment affirmed.