[Civ. No. 9339. Fourth Dist., Div. One. July 3, 1969.]

ANTOINETTE HASTIE et al., Plaintiffs and Appellants, v. MYRLAN DALE HANDELAND et al., Defendants and Respondents.

Gelfand, Berggreen & Feinberg and William Strong for Plaintiffs and Appellants.

Gilbert, Thompson & Kelly, Gilbert, Thompson, Kelly, Crowley & Jennett, John D. St. Pierre and Jean Wunderlich for Defendants and Respondents.

AULT, J. pro tem.*—Appellants, Antoinette Hastie and Marcia Hastie, are the widow and daughter respectively and the sole heirs at law of William L. Hastie. They brought this action for the wrongful death of William L. Hastie, claiming in the first cause of action that on May 25, 1962, the defendant Handeland, while in the employ of the defendant Raytheon Company, negligently drove and operated a Ford station wagon which collided with an automobile driven by Hastie proximately causing injuries which resulted in Hastie's death on January 11, 1963. The second cause of action was directed against the Anaheim Memorial Hospital and five individual doctors. It alleged that these defendants negligently and carelessly diagnosed, treated and cared for William L. Hastie in connection with the injuries he sustained in the automobile accident proximately causing his death.

---

*Assigned by the Chairman of the Judicial Council.

The Anaheim Memorial Hospital settled with Mrs. Hastie and her daughter before trial ($30,000), and the case proceeded against the remaining defendants. At the end of plaintiffs' case, motions for nonsuit were made by the individual doctors and were granted in each instance by the court. After all testimony was concluded, the court, on motion, directed a verdict in favor of the remaining defendants, Handeland and his employer Raytheon Company. It is from the judgment entered on the directed verdict that the Hasties appeal. No appeal was taken from the judgment of nonsuit made and entered in favor of the individual doctors.

■ The rules governing the power of the trial court to direct a verdict are the same as those which control in the granting of a nonsuit. They are set forth as follows in the leading case of *Estate of Lances,* 216 Cal. 397, 400 [14 P.2d 768] : "A nonsuit or a directed verdict may be granted 'only when, disregarding conflicting evidence and giving to plaintiff's evidence all the value to which it is legally entitled, herein indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff if such a verdict were given.' [citations]' ■ Unless it can be said as a matter of law, that, when so considered, no other reasonable conclusion is legally deducible from the evidence, and that any other holding would be so lacking in evidentiary support that a reviewing court would be impelled to reverse it upon appeal, or the trial court to set it aside as a matter of law, the trial court is not justified in taking the case from the jury.''

The question presented is whether the record contains substantial evidence upon which the jury could have found defendant Handeland and his employer Raytheon Company were legally responsible for the death of Mr. Hastie. Under the rules stated above, we must consider the evidence in the light most favorable to appellants.

At times during the years 1955 and 1956, the decedent Hastie had suffered episodes of pain in the area of his right shoulder. From time to time during those years, he consulted doctors in Sacramento and Santa Barbara concerning the problem and received treatment consisting of injections and neck traction which he applied himself at home. From that time until May 1962, he was free from pain, did not consult with doctors, and engaged in such activities as golf, swimming, hunting and fishing. On May 25, 1962, at approximately

6:15 p.m., his car was struck from the rear by an automobile driven by the respondent Handeland. The impact was minor, doing approximately $103 damage to the rear of decedent's car.

Immediately after the collision, decedent felt pain, numbness and a tingling sensation in and down his left arm and hand. That evening he was seen by a doctor in the emergency room of the Anaheim Memorial Hospital. That doctor continued to treat him for the next several months. His left arm was placed in a sling for a period of approximately six weeks; he received heat treatments and neck traction therapy. He continued to have pain and numbness in his left arm and hand. In November 1962, his attending physician referred him to a neurosurgeon, Dr. Mongeon for further treatment.

Dr. Mongeon took X-rays and diagnosed decedent's condition as degenerative disc disease located in the fifth and sixth cervical vertebrae. On January 6, 1963, decedent was admitted to the Anaheim Memorial Hospital, and the following day Dr. Mongeon performed a myelogram. The results were positive, indicating disc protrusion on the left between the fifth and sixth cervical vertebrae with nerve root compression. Dr. Mongeon scheduled decedent for surgery on January 8, because "he had had intractable, unrelieved left upper extremity pain; and there were findings, particularly X-ray findings, that confirmed the diagnosis of nerve compression."

On January 8, Dr. Mongeon performed a cervical laminectomy and found a calcified cartilaginous protruded disc lesion at the indicated level. The evidence is undisputed that both the degenerative disc disease and the protruded disc were of longstanding and both antedated the accident of May 25, 1962. There is substantial evidence a person with cervical degenerative disc disease, even with disc protrusion, may be symptom-free. There is also substantial evidence the accident of May 25, 1962, aggravated the preexisting condition and brought on the symptoms of pain and anesthesia in the left extremity.

Early on January 9, the day following surgery, decedent's temperature was recorded at 101 degrees, which was considered a normal post-operative temperature. Later that day his temperature receded to 99 degrees, but on January 10 it rose to 106 degrees and the following day it reached 107 degrees and death occurred. The fatal infection was diagnosed before death and the diagnosis was confirmed on autopsy. The cause of death was a "fulminating septicemia due to Group A beta

hemolytic streptococci." No focus of the infection was found, and while there was no evidence it originated in the surgical wound, the wound itself was infected as well as many other parts of the body which were tested. It was a generalized infection of the blood. Its source was not known, but it is probable it originated in the throat or nasopharnyx. Since the incubation period of the infectious strain does not exceed one, two or three days, decedent contracted the infection while a patient in the hospital. All hospital personnel and doctors who had contact with Mr. Hastie were cultured as soon as the infection was discovered and all tests were negative. Appellants produced no testimony which would tend to show, either directly or by inference, the hospital, its personnel or the doctors involved, were negligent in the care or treatment of the decedent. No proof was offered to show other patients in the hospital at the time were suffering from this particular infection.[1] At the time involved, streptococcus infections were common in the community at large and many people were carriers even though completely asymptomatic.

■ Respondents first contend the directed verdict was proper because the evidence was insufficient as a matter of law to establish decedent's hospitalization and surgery proximately resulted from the accident of May 25, 1962. This was not the basis upon which the trial court directed the verdict. While the medical evidence is undisputed decedent's degenerative disc disease and the disc protrusion both existed before the accident, other evidence in the record causally relates his hospitalization and surgery to the accident. Decedent had not experienced cervical problems between 1956 and the date of the accident, and he had not sought medical attention during that interval. Immediately after the accident, he felt pain and a tingling or numb sensation in his left hand and arm. He immediately consulted a doctor and continued to have medical treatment and therapy, including neck traction for several months. His treating physician finally sent him to a neurosurgeon for consultation "because his hand and arm did not improve." Medical experts testified the accident aggravated the preexisting cervical condition, and decedent's neurosurgeon stated he performed the surgery because "he

---

[1]Appellants assert in their brief that the answers of defendant Anaheim Memorial Hospital to plaintiffs' interrogations disclose an impressive number of cases in the hospital of the very streptococci which caused Mr. Hastie's death. We point out that these answers to interrogatories were not introduced in evidence nor did appellants prove the information contained therein at the trial.

had had intractable, unrelieved left upper extremity pain," a symptom which, under the evidence, had its origin in the accident. While in conflict, there is evidence in the record to support a finding the accident of May 25, 1962, aggravated decedent's preexisting back condition and was a substantial factor in bringing about the subsequent hospitalization and surgery which immediately preceded his death. A tortfeasor may be held responsible where the effect of his negligence is to aggravate a preexisting condition or disease. (*Taylor* v. *Sims,* 72 Cal.App.2d 60, 65 [164 P.2d 17]; *Perry* v. *McLaughlin,* 212 Cal. 1, 11 [297 P. 554]; *Jonte* v. *Key System,* 89 Cal.App.2d 654, 660 [201 P.2d 562]; Rest. 2d Torts, § 461.)

In support of the directed verdict, respondents' main contention, and what they delineate in their brief as the "sole issue involved," is framed in the form of a question: "Whether the mere fact that a patient contracts a fulminating septicemia due to Group A beta hemolytic streptococci while a patient in a hospital establishes malpractice on the part of such hospital, for which Mr. Handeland, as alleged wrongdoer, is responsible." Respondents reasoned their way to this position by first pointing out there is no evidence whatsoever, and no claim made, the injury suffered May 25, 1962, was, of itself, the cause of Mr. Hastie's death. Since the judgment of nonsuit granted as to all doctors has become final, their freedom from negligence has been adjudicated. This leaves only the conduct of the hospital in question, and they conclude: "Since, . . . the Hasties failed in the case at bar to prove any negligence on the part of the Hospital, and since they utterly failed to show that anything the Hospital did or omitted to do was the cause of decedent's death, they cannot prevail against defendant Handeland."

We agree the injury received by Mr. Hastie in the accident of May 25, 1962, was not of itself the cause of his death; we agree the doctors' freedom from negligence has been adjudicated and cannot be questioned on this appeal; we further agree appellants failed to prove at the trial any negligence on the part of the hospital caused or contributed to Mr. Hastie's death. However, we do not believe these determinations are dispositive of the question of respondents' legal responsibility for decedent's death. While it is true the original tortfeasor is liable for additional harm (even death) resulting from the negligent care and treatment of the original injury by physicians and hospitals (*Ash* v. *Mortensen,* 24 Cal.2d 654,

657 [150 P.2d 876] ; *Herrero* v. *Atkinson,* 227 Cal.App.2d 69. 75 [38 Cal.Rptr. 490, 8 A.L.R.3d 629]),[2] such liability is not limited to negligently caused additional harm or that caused by malpractice. The applicable rule is stated in section 457, Restatement Second of the Law of Torts: "If the negligent actor is liable for another's bodily injury, he is also subject to liability for any additional bodily harm resulting from normal efforts of third persons in rendering aid which the other's injury reasonably requires, irrespective of whether such acts are done in a proper or a negligent manner." (Vol. 2, p. 496.)

Thus, in *Simmons* v. *Lollar,* 304 F.2d 774, the tortfeasor was held responsible for death caused by cardiac arrest during back surgery necessitated by the original injury. There was no evidence of negligence or malpractice.

In *Adams* v. *Dantin* (La. App.) 107 So.2d 809, death resulted from brain damage precipitated by cardiac arrest during surgery necessitated by injuries sustained in an automobile collision. The negligent driver was held responsible for the death although there was no evidence of negligence on the part of the doctors performing the surgery.

In *Blackwell* v. *American Film Co.,* 189 Cal. 689 [209 P. 999], death was due to shock following surgery to correct an injury sustained in an automobile accident occurring two years before. The original tortfeasors were held responsible and there was no showing of negligence or malpractice upon the part of the doctors or the hospital.

In comment "a" under section 457 of the Restatement quoted above, the editors note: "The situation to which the rule stated in this Section is usually applicable is where the actor's negligence is the legal cause of bodily harm for which, even if nothing more were suffered, the other could recover damages. These injuries require the other to submit to medical, surgical, and hospital services. The services are so rendered as to increase the harm or even to cause harm which is entirely different from that which the other had previously sustained. In such a case, the damages assessable against the actor include not only the injury originally caused by the actor's negligence but also the harm resulting from the manner in which the medical, surgical, or hospital services are rendered, irrespective of whether they are rendered in a mistaken or negligent manner, so long as the mistake or negli-

---

[2]The rule presupposes the patient was not negligent in selecting the physicians and hospital. No such contention is made here.

gence is of the sort which is recognized as one of the risks which is inherent in the human fallibility of those who render such services.'' See also Prosser, Law of Torts (3d ed.) p. 318, and *Wallace* v. *Ludwig,* 292 Mass. 251 [198 N.E. 159], where under different but somewhat analagous circumstances, death resulted from the very infection here involved.

Under the above authorities appellants are not required to prove negligence or malpractice by the hospital or the treating physicians in order to fasten the legal responsibility for decedent's death upon respondents. If death resulted from a risk inherent in the medical treatment reasonably required to cure the injuries caused by the accident, respondents would be liable irrespective of whether such treatment was rendered in a proper or a negligent manner. The question is one of causation, and where the additional harm results either from the negligence of doctors or hospitals who furnish necessary medical care, or from the materialization of a risk inherent to necessary medical care, the chain of causation set in motion by the original tort remains unbroken. (*Blackwell* v. *American Film Co., supra,* 189 Cal. 689, 695; *Herrero* v. *Atkinson, supra,* 227 Cal.App.2d 69, 75.)

An examination of the record reveals evidence which at the very least raises a legitimate inference decedent's death resulted from a risk inherent in his hospitalization and surgery. Several of the doctors testified at the trial that developing an infection is one of the risks of any surgery and death is one of the risks of infection. The testimony of Dr. Schlosberg, appellants' expert, was more specific and dealt with the particular infection which caused decedent's death. His testimony on direct examination in this respect was:

''Q. All right. Now, Doctor, in your experience is infection one of the risks that any surgical, or for that matter, any hospitalized patient is exposed to?

''A. It is.

''Q. And this is true even with the best of surgery and the best of hospitals; isn't that true?

''A. That is true.

''Q. And isn't it true that one of the risks of infection, no matter how it is contracted or where it is contracted, is that the patient may die from the infection?

''A. That's quite obvious.''

On cross-examination the doctor's testimony takes on greater meaning:

"Q. Doctor, you have indicated that it is a risk of surgery that infection may occur?

"A. Correct.

"Q. And that's, of course, a possibility because all things are possible, aren't they?

"A. No, this is a definite risk, a statistical one.

"Q. Doctor, you are familiar with the case of Mr. Hastie to the extent that you have reviewed the hospital records at the Anaheim Memorial Hospital?

"A. Correct.

"Q. And I want you to assume that Mr. Hastie passed away due to a beta hemolytic streptococcus septicemia.

"⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅ ⋅

"Q. Okay. Now, Doctor, that is a rather exceptional infec tion following surgery, isn't it?

"A. You are asking me a question that I have to base on possibilities and probabilities. Does [Do] beta hemolytic strep infections occur after surgery?

"Q. Yes.

"A. Well, they did in this case. Yes, they do.

"Q. But it is a very exceptional case?

"A. Well, beta hemolytic strep infections are not common any time.

"Q. It is a very uncommon and occasional infection; isn't that true, Doctor?

"A. It is an occasional infection."

In the face of this testimony and the applicable law, we do not believe it can be said the evidence is insufficient as a matter of law to establish a causal relationship between the accident and decedent's death. Giving this evidence all the value to which it is entitled, including every legitimate inference that may be drawn therefrom, we feel it, when considered with other evidence in the case, raised a question of fact which should have been left for jury determination.

The judgment based upon the directed verdict is reversed.

Coughlin, Acting P. J., and Whelan, J., concurred.

A petition for a rehearing was denied July 22, 1969, and the petition of respondent Handeland for a hearing by the Supreme Court was denied August 27, 1969.