[No. D015368. Fourth Dist., Div. One. Mar. 1, 1994.]

DAVID MAXWELL, Plaintiff and Appellant, v.
LOUIS H. POWERS, Defendant and Respondent.

## COUNSEL

Janice R. Mazur for Plaintiff and Appellant.

Ault, Deuprey, Jones & Gorman and Alan H. Schonfeld for Defendant and Respondent.

## OPINION

**TODD, J.**—David Maxwell appeals a judgment of $44,100 in his favor and against Louis H. Powers, M.D., after a jury determined Powers, a trauma surgeon, was negligent in the diagnosis, care and treatment of Maxwell, who

had been in a motorcycle accident and eventually lost a kidney. Maxwell contends the trial court erred by failing to send the jury back for further deliberations with additional instructions after receiving an erroneous verdict form. Alternatively, Maxwell contends the trial court erred in refusing to consider juror affidavits for purposes of correcting the verdict or for granting a new trial. Maxwell also argues the trial court's refusal to give BAJI No. 14.66 was reversible error.

## FACTS

On November 11, 1987, Maxwell was involved in a motorcycle accident and suffered a number of traumatic injuries. He and the other person on the motorcycle were transported to the trauma unit at Scripps Hospital. The other person was dead on arrival. Maxwell was assessed and treated for injuries in Scripps's trauma unit by Powers, who has been on the hospital's staff since 1963.

Maxwell had possible brain injuries as evidenced by garbled speech and lack of orientation, four fractured ribs, internal hemorrhage in the abdominal cavity, an open-type injury and ligament damage to his right knee, a cracked and bleeding pelvis, a broken arm and a cracked incisor tooth.

Following a CAT scan, Powers performed emergency surgery on Maxwell in his peritoneal cavity to stop bleeding there. Powers suspected possible kidney injury and ordered an intravenous pyelogram (IVP) during the surgery. Although the IVP was not technically adequate, it confirmed that Maxwell had two kidneys and showed no gross extravasation of dye on the left kidney. Powers chose not to repeat the IVP because he was confident the kidney would heal itself since he did not detect any trauma to the kidney and he was in the midst of operating on the aorta.

A radiologist's report interpreting the IVP indicated the IVP showed serious injury to the left kidney. Powers did not review the report until Maxwell had been transferred to another hospital.

Maxwell was transferred to Kaiser Hospital on November 14, 1987. Powers recommended to a Kaiser physician that Kaiser conduct an additional IVP after the transfer to assure the kidney was all right. The recommendation was not followed. Maxwell was discharged from Kaiser Hospital on December 1, 1987. One week later, he was readmitted to Kaiser Hospital with rigidity of the left abdomen, vomiting and inability to eat. Surgeons at Kaiser removed Maxwell's left kidney.

Marshall Orloff, M.D., plaintiff's expert, testified it was below the standard of care for Powers to fail to review the radiology report on the kidney.

Additionally, a repeat IVP could have been performed without danger to Maxwell. Orloff also testified that despite the technical flaws in the IVP, Powers should have realized from the IVP there was kidney damage. Orloff opined there was a better than 90 percent probability, to a reasonable medical certainty, that the kidney could have been saved had kidney surgery been performed on the day Maxwell was admitted to Scripps Hospital. Orloff opined it is medically probable the kidney could have been saved had surgery been performed on the day after Maxwell's admission to Scripps Hospital. It was also probable the kidney could have been saved had surgery been performed the following day, but less likely. With each passing day, the likelihood of saving the kidney lessened, Orloff testified.

Vital Haynes, M.D., the defense expert, testified Powers met the standard of care required of a trauma surgeon in his treatment of Maxwell.

On January 23, 1989, Maxwell filed a complaint for personal injuries against Powers, another doctor, and Kaiser Foundation Health Plan, Inc., alleging medical malpractice against each defendant.[1] On February 14, 1989, Powers filed a general denial, in which he asserted several affirmative defenses, including comparative negligence by Maxwell and assumption of risk. On March 29, 1989, Maxwell and Kaiser filed a stipulation to stay the superior court action pending arbitration pursuant to Code of Civil Procedure section 1280 et seq.

Maxwell's lawsuit against Powers proceeded to trial on April 24, 1991. The jury began deliberating on May 1. On May 3, the jury sent a note to the court stating it was deadlocked seven to five. The court instructed the jury to resume deliberations. On May 6, the jury sent another note to the court stating it was deadlocked at six to six. The jury was polled and reinstructed to continue deliberations.

On May 7, the jury returned a verdict in Maxwell's favor by a vote of nine to three, finding Powers was negligent in the diagnosis, care and treatment of Maxwell and such negligence was a legal cause of Maxwell's injury. The verdict also specified Maxwell sustained $10,000 in damages for past pain and suffering and $10,000 in damages for future pain and suffering. The verdict specified Maxwell's future medical care would be $777,474 and found the present cash value of the future medical care was $42,300. The verdict also attributed 9 percent of the fault for Maxwell's injury to Powers and 91 percent to others. Under the foreman's signature, at the end of the verdict form, the words "See Jury Intention on Separate Paper" were interlineated in longhand. Accompanying the verdict form was a jury request form on which the foreman had written:

---

[1]The other doctor was later dismissed as a defendant.

"It is the intention of this jury to reflect a total compensation package of $692,222 with Dr. Powers apportioned 9% of the total responsibility in total payment resulting in a payment to Mr. Maxwell of $62,300.

"We have added answer 3, 4 and 5b to obtain our total."

The jury was excused following the reading of the verdict, and counsel and the court discussed the verdict and the jury's note. No decision was made at that time and the court recessed for the evening. The following morning, Maxwell's counsel requested the jury be sent back for further deliberations with an instruction that its note could not be considered, the figures on the verdict form should not be reduced by the amount of fault allocated to other parties and the court would make any appropriate apportionment. The court refused to return the jury for further deliberations. The court ruled the verdict form was proper, the separate note would not be considered and it accepted the verdict form as written. The jury was discharged.

On June 13, 1991, Maxwell moved to correct the verdict or for a new trial on damages based on the misconduct of the jury in reducing the total damage award by 91 percent. Maxwell filed several juror affidavits as part of his motion. The trial court ruled the affidavits inadmissible and denied the motion.

On July 10, 1991, the trial court entered judgment in favor of Maxwell and against Powers in the amount of $44,100.

## DISCUSSION

### I

To the extent that Maxwell argues the trial court should have sent the jury back for further deliberations with additional instructions after receiving the verdict form and attached note, we agree. We, however, reject Maxwell's alternative arguments that the trial court should have corrected the erroneous verdict form or that this court should order correction of the verdict without remand for a new trial in large part because we find the post-trial juror affidavits were inadmissible. We shall take up these arguments seriatim.

### A.

■ Here, the trial court chose to ignore the jury's note attached to the verdict form. For the reasons that follow, we find that was error.

The note, which was incorporated by reference on the verdict form, disclosed the jury, in contravention of its duty, apportioned the damages awarded against Powers to reflect what it found was his relative fault. While as trier of fact, the jury was instructed to determine the relative fault of Powers, it was not instructed or authorized to perform any apportionment of the damages. "A verdict which goes beyond the issues of the case as stated in the instructions on the law given by the court to the jury, is not in conformity with the instructions and is therefore 'insufficient' " within the meaning of section 619 of the Code of Civil Procedure. (*Crowe* v. *Sacks* (1955) 44 Cal.2d 590, 596 [283 P.2d 689].) Section 619 of the Code of Civil Procedure states: "When the verdict is announced, if it is informal or insufficient, in not covering the issue submitted, it may be corrected by the jury under the advice of the court, or the jury may be again sent out."

In *Phipps* v. *Superior Court* (1939) 32 Cal.App.2d 371, 374 [89 P.2d 698], the Court of Appeal stated: "The court retains control of the jury until it is discharged and has the authority to return the jury to the jury room for further deliberation in an effort to obtain a verdict conforming to statutory provisions. When the court's attention is called to an improper verdict, it is the court's duty to further instruct the jury upon the subject of the legal limitation of the verdict under consideration [citation] . . . ."

In view of the jury note, it was obvious that the jury had misconstrued and improperly carried out its mission. The trial court implicitly stated it would not consider the jury note because to do so would be an impermissible invasion of the province of the jury. Such treatment would have been proper had the jury note been an affidavit by a juror presented post trial to explain the jury's mental processes in an effort to impeach the jury verdict, as we discuss, *post*. However, the jury note was not a juror affidavit, but rather it was a concurrent statement by the jury explaining its verdict and was incorporated by reference into the verdict. Therefore, we reject the trial court's implicitly analogizing the jury note to a juror affidavit that violated Evidence Code section 1150. Nor can we accept Powers's argument that the trial court properly disregarded the note as surplusage. Of course, we are mindful of the general rule that "[a] verdict should be interpreted so as to uphold it and give it the effect intended by the jury, as well as one consistent with the law and the evidence." (7 Witkin, Cal. Procedure (3d ed. 1985) Trial, § 343, p. 343.) However, here the jury note, which was incorporated into the verdict form by reference, cannot properly be disregarded as surplusage because it directly and patently evidenced the jury improperly went beyond its factfinding duty, rendering the verdict insufficient as a matter of law within the meaning of Code of Civil Procedure section 619. Under the circumstances presented here, we find the trial court abused its discretion by

not sending the jury back with further instructions delineating its proper duties.[2] Accordingly, the judgment must be reversed and the case remanded for a new trial on damages only.

## B.

Maxwell contends the trial court should have corrected the verdict on the basis of juror affidavits he submitted as part of his motion for a new trial.[3] We disagree because the affidavits were inadmissible. Accordingly, we also must reject Maxwell's suggestion that we order correction of the verdict in lieu of a remand for a new trial on damages based on the affidavits.

Evidence Code section 1150 provides: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." (Italics added.)

The juror affidavits submitted by Maxwell recited the reasoning process the jury employed during deliberations to arrive at its damages figures. (See fn. 3, *ante*.) As such, the affidavits reflected the jurors' subjective mental processes and constitute inadmissible evidence to impeach a verdict. (*Mesecher* v. *County of San Diego* (1992) 9 Cal.App.4th 1677, 1684 [12 Cal.Rptr.2d 279].) *Mesecher*, *supra*, 9 Cal.App.4th 1677, in which the appellants submitted juror declarations reciting how jurors during deliberations defined the tort of battery in conflict with the court's definition of battery, is instructive. The trial court ruled the declarations were inadmissible, and this court agreed. (*Id.* at pp. 1682-1683.) We stated: "While 'jurors may testify to "overt acts"—that is, such statements, conduct, conditions, or events as are "open to sight, hearing, and the other senses and thus subject to

---

[2]None of the authorities relied upon by Powers to the contrary is on point.

[3]The juror affidavits generally indicated the jury determined Maxwell's future special damages equaled $470,000. The jury reduced this figure by 91 percent and obtained $42,300—the figure that appears on line 5(b) of the verdict form. The jury then used the present value table to calculate the value of $42,300 at a 5 percent rate of return over 51.5 years, yielding a figure of $777,474, which is the figure that appears on line 5(a) of the verdict form. The affidavits also indicated that the $10,000 figures on lines 3 and 4 of the verdict form for past and future pain and suffering represent the jury's calculation of what it thought should be Powers's 9 percent share of the $111,111.11 it concluded Maxwell actually suffered in past pain and suffering and the $111,111.11 it concluded Maxwell will suffer in future pain and suffering.

corroboration"—[they] may not testify to "the subjective reasoning processes of the individual juror . . ." (*People* v. *Hutchinson*, [(1969) 71 Cal.2d 342] at pp. 349-350 . . . .)' (*In re Stankewitz* (1985) 40 Cal.3d 391, 398 . . . ; see Evid. Code, § 1150, subd. (a).) Likewise, evidence about a jury's 'subjective collective mental process purporting to show *how* the verdict was reached' is inadmissible to impeach a jury verdict. (*Ford* v. *Bennacka* (1990) 226 Cal.App.3d 330, 336, . . . first italics added.) Thus, juror declarations are inadmissible where, as here, they 'at most suggest "deliberative error" in the jury's collective mental process—confusion, misunderstanding, and misinterpretation of the law.' (*Ibid.*; accord *People* v. *Romero* (1982) 31 Cal.3d 685, 694 . . . ; *People* v. *Hall* (1980) 108 Cal.App.3d 373, 379 . . . .)" (*Mesecher* v. *County of San Diego*, *supra*, 9 Cal.App.4th at p. 1683, fn. omitted.)

We went on to say: "[T]he jurors' statements themselves did not constitute misconduct, nor do they reflect an outside influence brought into the courtroom. Rather, the alleged misconduct arose from the way in which the jury interpreted and applied the instructions. Such evidence is inadmissible." (9 Cal.App.4th at p. 1684.)

Here, the juror affidavits attempted to show how the jurors arrived at the damages figures that were recorded in the verdict form. They explained the jurors' collective mental processes and, as such, were inadmissible.

## C.

While the jury note clearly evidenced the jury misunderstood its mission and the consequential defect in the verdict form, we conclude the defect cannot be corrected without a new trial as Maxwell urges under *King* v. *Unger* (1939) 35 Cal.App.2d 192 [94 P.2d 1040]. Maxwell would have us correct the verdict by inserting $470,000 as the special verdict reflecting his future special damages and $111,111.11 for past pain and suffering and $111,111.11 for future pain and suffering. However, the jury note, in attempting to explain that the jury found Maxwell's total damages to be in the amount of $692,222 ("total compensation package"), did not rationally disclose how the jury arrived at a figure for Maxwell's future special damages. The jury verdict shows future special damages in the amount of $777,474. Considering this item only, we have reviewed the record, and there is no direct evidentiary support for this figure. The jury note does not shed light on how this figure was derived. Therefore, in light of the inadmissibility of the juror affidavits, there is nothing before us to support a correction of the verdict along the lines urged by Maxwell.

## II

 Maxwell contends the trial court committed reversible error by refusing to give BAJI No. 14.66 regarding an original tortfeasor's liability for aggravation of injury due to subsequent negligent medical care. The contention has merit, and on remand for new trial, the instruction should be given if requested.

BAJI No. 14.66 reads in pertinent part: "If you find that the defendant is liable for the original injury [if any] to the plaintiff, he is also liable:

". . . . . . . . . . . . . . . . . . . . . . . .

"(2) [For any aggravation of the original injury or additional injury caused by negligent medical or hospital treatment or care of the original injury.]"

BAJI No. 14.66 reflects the well-established legal principle that was articulated in *Ash* v. *Mortensen* (1944) 24 Cal.2d 654, 657 [150 P.2d 876]: "It is settled that where one who has suffered personal injuries by reason of the tortious act of another exercises due care in securing the services of a doctor and his injuries are aggravated by the negligence of such doctor, the law regards the act of the original wrongdoer as a proximate cause of the damages flowing from the subsequent negligent medical treatment and holds him liable therefor."

*In Hastie* v. *Handeland* (1969) 274 Cal.App.2d 599, 605 [79 Cal.Rptr. 268], we pointed out the rule also is embodied "in section 457, Restatement Second of the Law of Torts: 'If the negligent actor is liable for another's bodily injury, he is also subject to liability for any additional bodily harm resulting from normal efforts of third persons in rendering aid which the other's injury reasonably requires, irrespective of whether such acts are done in a proper or a negligent manner.' (Vol. 2, p. 496.)"

The principle usually appears in cases involving automobile accidents, where the initial tortfeasor's careless driving exposed the plaintiff to a risk of physical harm, including medical treatment for the injuries resulting from the accident. The initial tortfeasor therefore is liable for the resultant medical treatment. The rationale for the rule is that such medical treatment "is closely and reasonably associated with the immediate consequences of the defendant's act and forms a normal part of its aftermath." (*Munoz* v. *Davis* (1983) 141 Cal.App.3d 420, 427 [190 Cal.Rptr. 400].) Put more succinctly, the rationale has been expressed as "subsequent negligent medical treatment is foreseeable as a matter of law." (*Blecker* v. *Wolbart* (1985) 167

Cal.App.3d 1195, 1201 [213 Cal.Rptr. 781].) The *Blecker* court also pointed out that when subsequent medical treatment of an injury results in aggravation of the injury, the original tortfeasor is liable because he or she "is always considered to be a proximate cause of the plaintiff's further injuries." (*Id.* at p. 1203.)

Here, because of the facts and the way in which the case was tried, we are presented with the question of whether the *Ash* v. *Mortensen* rule should apply to the first doctor who treats a patient, who subsequently is treated by other doctors. Regardless of the fact that Maxwell was injured in a motorcycle accident, we can only conclude from the record on appeal[4] that this case was tried basically as a medical malpractice case, largely on plaintiff's theory that Powers's failure to diagnose Maxwell's kidney injury and treat it for three days while Maxwell was under his care and treatment was the initial tort. The thrust of the defense case was that Powers's treatment met the standard of care and further that the injury to the kidney was aggravated while Maxwell was at Kaiser.

■ Parties have the "right to have the jury instructed as to the law applicable to all their theories of the case which were supported by the pleadings and the evidence, whether or not that evidence was considered persuasive by the trial court." (*Fish* v. *Los Angeles Dodgers Baseball Club* (1976) 56 Cal.App.3d 620, 633 [128 Cal.Rptr. 807, 91 A.L.R.3d 1].) "A reviewing court must review the evidence most favorable to the contention that the requested instruction is applicable since the parties are entitled to an instruction thereon if the evidence so viewed could establish the elements of the theory presented. [Citation.]" (*Christian* v. *Bolls* (1970) 7 Cal.App.3d 408, 415-416 [86 Cal.Rptr. 545].)

■ Viewing the evidence most favorable to Maxwell, we conclude it supports a theory with respect to medical malpractice that Powers was the original tortfeasor, that is, as the first treating physician in the chain, all

---

[4]The reporter's transcript does not include the testimony of any nonexpert witnesses with the exception of Powers and a radiologist. As to what the jury was told about how Maxwell was initially injured, the record before us discloses that the trial court ruled in a pretrial motion the jury would be informed that Maxwell and a friend were in a motorcycle accident before being transported to Scripps Hospital. In another pretrial ruling, the court granted Maxwell's motion for a protective order regarding evidence of Maxwell's drinking before the accident over Powers's objection and offer of proof that Maxwell had a blood-alcohol level of .24 at the time he was admitted to the hospital. Maxwell's counsel had represented to the court that Maxwell was the passenger, not the driver, of the motorcycle when the accident occurred. While Powers's counsel, in his closing argument, made the point that Maxwell lost a kidney "because he was on a motorcycle that hit a pole . . . ," the bulk of his closing argument dealt with defending the quality of care Powers gave Maxwell.

subsequent medical negligence relates back to him. Accordingly, it was error not to give BAJI No. 14.66 as requested by Maxwell.[5]

■ We are not persuaded by Powers's appellate argument that Maxwell waived or is estopped to claim entitlement to BAJI No. 14.66 because he successfully kept evidence of his drinking before the accident from being presented to the jury, thereby precluding Powers from putting on evidence that Maxwell was the original tortfeasor. When Maxwell's motion to exclude evidence of his blood-alcohol level was heard, Powers's counsel made no offer of proof that the facts of the motorcycle accident were crucial to his case to prove Maxwell's negligence even though Powers's answer to the complaint included comparative negligence on Maxwell's part and assumption of risk as affirmative defenses. The only argument that Powers's counsel offered at that point for allowing evidence of Maxwell's drinking was that it was relevant to Powers's initial treatment. In essence, counsel argued Powers suspected neurologic damage because of Maxwell's incoherent demeanor when he was admitted to the hospital, and this assessment affected his treatment of Maxwell, including ordering a CAT scan of the brain. At no point during this argument did Powers's counsel argue Maxwell's drinking was relevant to Maxwell's comparative negligence or argue it was relevant to proving someone other than Powers was the original tortfeasor. Powers, of course, had the right to prove properly pleaded affirmative defenses such as plaintiff's comparative negligence or assumption of risk. Here, however, when Powers's counsel had the opportunity to raise them by making an offer of proof at this hearing, he did not do so. In short, he abandoned them. Therefore, we cannot accept Powers's waiver or estoppel argument on appeal that Maxwell's success in keeping out evidence of his drinking before the accident precludes Maxwell assignment of error on BAJI No. 14.66.

■ Nor are we persuaded by Powers's argument that BAJI No. 14.66 has never been applied (presumably in a published case) to the initial doctor who provided medical treatment for an injury caused by a nonmedical accident.

Powers does not offer any policy reason to preclude the instruction when there is successive medical care provided by a chain of doctors. Nor can we discern one. As the court observed in *Carter* v. *Shirley* (1986) 21 Mass.App. 503 [488 N.E.2d 16]: "[T]he principle expressed by . . . § 457 of the

---

[5]The record is bereft of the trial court's reasons for declining to give the instruction. Counsel for Powers declined the trial court's invitation to make a record with respect to his objections to the instruction.

Restatement (Second) does not focus on the identity or the profession of the original tortfeasor. Rather, the principle focuses on the subsequent negligence of the second actor and deems it a foreseeable risk of the primary negligence so that the original tortfeasor may be held responsible for it, at least in circumstances like those in this case. . . ." (*Id.* at p. 20, fn. 14.)

We note a number of out-of-state cases have held a physician is liable for foreseeable harm caused by later treatment provided by other physicians. In *Lindquist* v. *Dengel* (1979) 92 Wn.2d 257 [595 P.2d 934, 936-937], the Washington Supreme Court rejected an argument that the tort rule of liability for harm resulting from medical treatment necessitated by a tortfeasor's negligent conduct was not intended to apply and should not apply where the alleged tortfeasor is a physician.

"The rationale of the rule as applied to medical treatment is that negligent or harmful medical treatment is within the scope of the risk created by the original negligent conduct. *See* Restatement (Second) of Torts § 457, Comment b at p. 497 (1965).

"Petitioner contends this rule is not intended to apply where the original tortfeasor is a physician, because the foreseeable risk is that the injured person will be forced to submit to medical services, which inevitably carry the risk of increased harm. Where the injured person has already submitted to medical treatment, petitioner argues, the rule does not apply. This appears to be a distinction without a difference. As noted by the Court of Appeals, where malpractice results in an injury for which a physician is liable, the risk created includes that of additional medical treatment and, perhaps, additional harm. There is no reason in principle to create a special exception to the rule of liability for harm which is foreseeable and within the scope of the risk merely because the tort-feasor is a physician. [Citation.]" (595 P.2d at p. 937.)

Similarly, in *Carter* v. *Shirley*, *supra*, 488 N.E.2d at page 20, the court said: "We see no reason why the rule should not apply to physicians whose original negligence causes the intervention of a second physician . . . ." (Accord, *Atlanta Obstetrics* v. *Coleman* (1990) 260 Ga. 569 [398 S.E.2d 16, 17] [affirming finding that first doctor's negligence "initiated the chain of events that resulted in the injury."]; *Corbett* v. *Weisband* (1988) 380 Pa.Super. 292 [551 A.2d 1059, 1072-1073].)

While we find it was error not to give BAJI No. 14.66 under the circumstances presented here, we reject Maxwell's suggestion that we determine what the jury would have found had the instruction been given. Jury determinations should be left to juries properly instructed in the law.

## DISPOSITION

Judgment reversed; remanded for new trial on issues of damages and apportionment of fault.

Work, Acting P. J., and Benke, J., concurred.

A petition for a rehearing was denied March 29, 1994.