[No. B070572. Second Dist., Div. Seven. July 21, 1994.]

WILLIAM ENGLISH, Plaintiff and Respondent, v.
MEI FHU LIN, Defendant and Appellant.

COUNSEL

Wesierski & Zurek, Ronald Zurek, Horvitz & Levy, Barry R. Levy and H. Thomas Watson for Defendant and Appellant.

Wendy Rossi for Plaintiff and Respondent.

OPINION

LILLIE, P. J.—In this action involving an accident between an automobile and pedestrian, defendant appeals from a judgment entered on special verdict in favor of plaintiff for $538,000 plus costs. On appeal, defendant contends that the judgment should be reversed due to prejudicial jury misconduct during deliberations, when a juror allegedly communicated to the other jurors information outside the evidence in the case.

### FACTUAL AND PROCEDURAL BACKGROUND

Viewing the evidence favorably in support of the judgment, as we must, the record establishes the following facts:

In February 1987, when he was 22 years old, plaintiff was employed as a shopping cart runner by Fedco; he was returning a row of shopping carts left by Fedco customers in the parking structure when defendant's car hit the carts, which shot back at him and knocked him to the ground; plaintiff felt pain in his left knee; he was put into a wheelchair and taken to the hospital. In July and November 1987, plaintiff underwent two arthroscopic surgeries on his left knee; at the July surgery, Dr. Siebold, an orthopedic surgeon, found the knee ligaments were not torn, but a little loose; after the July surgery, but before the November 1987 surgery, plaintiff's left meniscus was torn, and it was removed in the November surgery. According to Dr. Siebold, the Fedco injury caused plaintiff's left knee to be predisposed to earlier arthritic changes; plaintiff also suffered back pain in the accident and had a disc bulge in his lower back "bordering on a herniation."

According to plaintiff, he did not play football after the Fedco accident; he had planned to play college football on scholarship; his plan was to use his football scholarship to finance his degree from a four-year college, where he wanted to major in commercial art; he wanted to play professional football and then become a commercial artist.

According to plaintiff's high school football coach, James Brownfield, plaintiff played football as a wide receiver in 1982, his junior year; plaintiff won two awards and played in the all-star game during his senior year; plaintiff was an excellent wide receiver and as talented as several other wide receivers he had coached who went on to play professional football.

After high school, plaintiff went to Pasadena City College and made the football team; he did not get a chance to play because the school already had 10 wide receivers. Plaintiff then got a football scholarship to Taft Junior

College and was a wide receiver on the football team for two seasons; between the two seasons, he had arthroscopic surgery on his right knee because of calcium deposit buildup on his kneecap; at Taft, he also had a cortisone shot in each knee for tendonitis.

After obtaining a two-year degree at Taft, he obtained a two-year football scholarship to Eastern Illinois University in July 1986; in August 1986, during practice, he injured his left knee, and was not able to play football in the fall of 1986; he left Eastern Illinois University in December 1986 because he could not play football and because he would not have been able to graduate with a four-year degree because the University did not accept all his credits from Taft; Eastern Illinois also did not offer his major, commercial art.

Plaintiff returned to California; he planned to enroll in Moorehead State, which had previously offered him a football scholarship, which he had turned down to go to Illinois; in the meantime, he obtained two jobs to help pay off his student loan from Taft; he worked in a liquor store and as a cart runner at Fedco. After the February 1987 accident at Fedco, plaintiff did not resume work until about January 1990, when, after several months of training, he obtained a job as a computer draftsman. At the time of trial, his left knee and lower back still bothered him several days per week; he was "no longer an athletic person," and had not played football or basketball since the accident.

According to Dr. Siebold, 75 percent of plaintiff's left knee problems was due to the Fedco accident and 25 percent was due to prior injuries. Although Dr. Siebold did not recommend back surgery at that time, if plaintiff experienced more pain in the future, he could require a laminectomy at a cost of about $20,000; with plaintiff's back problem, he would not release him to play football, even if he did not also have his knee problems.

According to defendant's testimony, she was stopped in her car and watched for two or three seconds while plaintiff pushed a row of carts straight into her car; she did not try to back up; she did not honk her horn because she did not know how to use it. According to Dr. McColl, a defense orthopedic surgeon who examined plaintiff in January 1990, both of plaintiff's knees appeared intact; a thermogram revealed that his back and legs were normal; in his opinion, plaintiff did not suffer any herniated disc injury and his knee would not preclude plaintiff from playing sports.

In argument to the jury, plaintiff's counsel requested that the jury compensate plaintiff for the loss of his dream—"to play pro ball and then go on

to be a commercial artist; get his four-year degree, paying [for] it with his football abilities." Plaintiff also sought damages for past medical expenses of about $23,400, future medical expenses of $20,000, lost wages of about $30,000, and damages for pain and suffering in the amount of $600,000.

In its special verdict, the jury unanimously determined that defendant was negligent, defendant's negligence caused damage to plaintiff, and the total amount of damages suffered by plaintiff was $538,000. The jury also unanimously found that plaintiff was negligent, but nine of the twelve jurors found that plaintiff's negligence was not a legal cause of damage to him.

Defendant moved for new trial on the ground of jury misconduct; her motion was supported by the declaration of Juror Elmer Larsen, Jr. Larsen declared: "During deliberations, many of the jurors concluded that the plaintiff's injuries kept him from finishing college. Much consideration was given by many of the jurors to the loss of earnings which plaintiff sustained as a result of his lost college. One juror, Leroy Foster, said that he had a brother-in-law who was a commercial artist. He said that this relative began that job at the salary rate of $42,000 a year. He said also that this relative now makes well over $100,000 a year. [¶] In deliberations, many of the jurors concluded that but for the subject accident, plaintiff would have secured a job similar to that of Mr. Foster's relative. During deliberations, a substantial part of the discussion included the loss of earnings plaintiff supposedly sustained. The verdict amount included money for loss of earnings and earning capacity based upon the figures presented by Mr. Foster."

Plaintiff opposed the motion for new trial on the ground that the verdict was not impeachable with Larsen's declaration which "only speculates as to the subjective thought processes of the other jurors," and that as no objective verifiable calculation of the amount of damage for each item of loss was made in the verdict, defendant could not now claim error or jury misconduct in this regard. After hearing, the court denied the motion for new trial. Defendant filed timely notice of appeal from the judgment. She contends that "Juror Larsen's uncontroverted affidavit established that during deliberations juror Foster improperly communicated evidence not admitted at trial concerning English's loss of future income and the jury improperly based its verdict on this extra-judicial evidence."

I

STANDARD OF REVIEW

"Jurors are not supposed to receive or communicate to fellow jurors information from sources outside the evidence presented in court. [Citation.]

If they do, they are guilty of misconduct." (*Lankster* v. *Alpha Beta Co.* (1993) 15 Cal.App.4th 678, 682 [18 Cal.Rptr.2d 923].) ■ "Declarations recounting statements, conduct or events 'open to sight, hearing, and the other senses and thus subject to corroboration' are admissible to establish juror misconduct. Declarations submitted as proof of an individual juror's subjective reasoning processes, which can be neither corroborated nor disproved, are not." (*Id.* at p. 681, fn. 1.)

■ " 'It is well settled that a presumption of prejudice arises from *any* juror misconduct. . . . However, the presumption may be rebutted by proof that no prejudice actually resulted.' " (*Jones* v. *Sieve* (1988) 203 Cal.App.3d 359, 367 [249 Cal.Rptr. 821], italics in original.) " 'A denial of a motion for new trial grounded on jury misconduct implies a determination by the trial judge that the misconduct did not result in prejudice.' " (*Tillery* v. *Richland* (1984) 158 Cal.App.3d 957, 970 [205 Cal.Rptr. 191].) ■ " 'In reviewing the denial of a motion for new trial based on jury misconduct, the appellate court "has a constitutional obligation [citation] to review the entire record, including the evidence, and to determine independently whether the act of misconduct, if it occurred, prevented the complaining party from having a fair trial." . . .' " (*Smoketree-Lake Murray, Ltd.* v. *Mills Concrete Construction Co.* (1991) 234 Cal.App.3d 1724, 1745 [286 Cal.Rptr. 435].) We "must examine the record to determine whether there is a reasonable probability of actual harm to the complaining party resulting from the misconduct. Some of the factors to be considered in this connection are 'the strength of the evidence that misconduct occurred, the nature and seriousness of the misconduct, and the probability that actual prejudice may have ensued.' " (*Elsworth* v. *Beech Aircraft Corp.* (1984) 37 Cal.3d 540, 557 [208 Cal.Rptr. 874, 691 P.2d 630].)

In the instant case, we infer from our record that the trial court determined that there was insufficient evidence of juror misconduct, or that if misconduct occurred, it was not prejudicial. The trial court's ruling is correct on both grounds.

## II

### WHETHER MISCONDUCT OCCURRED

■ To the extent the trial court concluded that there was insufficient evidence of juror misconduct, we agree with such conclusion. The statements in Larsen's declaration that "Much consideration was given by many of the jurors to the loss of earnings which plaintiff sustained as a result of his lost college," and "During deliberations, a substantial part of the discussion

included the loss of earnings plaintiff supposedly sustained," do not describe any improper juror conduct, and appellant does not appear to contend such discussions were improper. As the jury was instructed on the issues of loss of earnings and loss of earning capacity, discussion and consideration of such issues was proper.

As to Juror Foster's statements about his brother-in-law's salary as a commercial artist, the declaration lacks specificity regarding the actual circumstances under which the statements were made. For example, it is unclear whether Foster's statements were offered to explain why Foster found certain testimony credible or not credible, or a damage award too low or too high.

"Interestingly, there is little decisional law on the question of what is proper discussion among jurors during deliberations, and the few cases are quite ancient. In *Baker* v. *Borello* (1902) 136 Cal. 160 . . . , the California Supreme Court approved an instruction which told the jurors to deliberate in light of their general knowledge on the subject. 'Jurors, in weighing evidence, always exercise their judgment in the light of their own general knowledge of the subject in hand, whether instructed to do so or not; and a judgment will not be reversed whether they are or are not so instructed.' " (*Wagner* v. *Doulton* (1980) 112 Cal.App.3d 945, 949 [169 Cal.Rptr. 550].)

The court in *Wagner* concluded: "We believe the appropriate rule has been well articulated by an opinion of a sister state: 'In determining what is proper and what is improper discussion among jurors, regard must be had for the fact that the jury are supposedly men [and women] of different walks of life, avocations, and necessarily views that would be affected by their past experiences and situations. They could hardly arrive at a solution of their differences without discussion of the facts before them, and each man's discussion would necessarily be tinged or affected by his own viewpoint and experience.' (*Frazer* v. *State* (1924) 99 Tex.Crim. 89 . . . .)" (112 Cal.App.3d at p. 950.)

Because of the lack of a specific context for Foster's statements, the trial court reasonably could have concluded that the declaration was insufficient to show that Foster's remarks were intended by him, or interpreted by other jurors, as additional evidence to consider in this case, as opposed to an explanation as to Foster's reasoning processes—i.e., why Foster believed or disbelieved certain witnesses or believed an award of damages would be appropriate or inappropriate or too low or too high. We also conclude that Larsen's declaration lacks sufficient specificity to show the nature and extent of any open discussion about the subject of the plaintiff's loss of earning

capacity, and whether any of the jurors deemed Foster's statements to constitute evidence on this point. Moreover, nothing in his declaration establishes any agreement, express or implied, to consider Foster's statements as evidence. In other words, the trial court reasonably could have concluded that the declaration was insufficient to establish that the jury violated the instruction to "decide all questions of fact in this case from the evidence received in this trial and not from any other source," and that the jurors "must not make any independent investigation of the facts or the law or consider or discuss facts as to which there is no evidence. . . ." (BAJI No. 1.00.5.)

Further, because Foster's statements do not directly concern the plaintiff's case or situation, the trial court reasonably could have concluded that the remarks would not have been likely to influence Foster or the other jurors in the manner that the injection of information from newspaper articles about the case were held to have done in *Province* v. *Center for Women's Health & Family Birth* (1993) 20 Cal.App.4th 1673, 1679-1680 [25 Cal.Rptr.2d 667]. (See also *Jutzi* v. *County of Los Angeles* (1987) 196 Cal.App.3d 637, 655-656 [242 Cal.Rptr. 74] [juror related personal experience at county hospital 18 years earlier to other jurors; trial court did not abuse discretion in denying motion for new trial because juror's experience had no direct bearing on issues in case, the information was not current, and did not involve doctor who had treated plaintiff or same section of hospital].)

Although the remarks of Mr. Foster and the discussion of issues by the jury can be characterized as overt acts, the remaining portion of Larsen's declaration reasonably can only be construed as asserting the mental processes of the jurors. The statement that the jurors "concluded" certain things in deliberations "would seem to concern a juror's mental processes, and declarations regarding them, accordingly, would be inadmissible under [Evidence Code] section 1150." (*Krouse* v. *Graham* (1977) 19 Cal.3d 59, 81 [137 Cal.Rptr. 863, 562 P.2d 1022].) Further, neither in Larsen's declaration nor elsewhere in the record is there evidence of any overt acts—that is, statements, conduct, or events open to sight, hearing or the other senses, to support Larsen's conclusory allegations that "many of the jurors concluded that but for the subject accident, plaintiff would have secured a job similar to that of Mr. Foster's relative," and "The verdict amount included money for loss of earnings and earning capacity based upon the figures presented by Mr. Foster." Accordingly, the trial court reasonably could have concluded that the instant case is distinguishable from those cases involving objectively verifiable express or implied agreements by jurors to include a specific item of damages in the verdict. (See, e.g., *Krouse* v. *Graham, supra,* 19 Cal.3d at p. 81.)

We also conclude that Larsen's declaration, for the most part, attempts to impeach the verdict with statements about the jury's alleged subjective collective mental process as to how the verdict was reached. ■ Yet, "evidence about a jury's 'subjective *collective* mental process purporting to show *how* the verdict was reached' is inadmissible to impeach a jury verdict. [Citation.] Thus, juror declarations are inadmissible where, as here, they 'at most suggest "deliberative error" in the jury's collective mental process—confusion, misunderstanding, and misinterpretation of the law.' [Citations.]" (*Mesecher* v. *County of San Diego* (1992) 9 Cal.App.4th 1677, 1683 [12 Cal.Rptr.2d 279], italics in original [six juror declarations stated the jury defined "battery" in a manner conflicting with the court's instructions].)

In *Mesecher*, the court also explained that the defendant could not "avoid the impact of these rules by focusing on the fact that several of the jurors *communicated* their misunderstanding of the instructions during deliberations. However, '[t]he subjective quality of one juror's reasoning is not purged by the fact that another juror heard and remembers the verbalization of that reasoning.' To hold otherwise would destroy the rule . . . which clearly prohibits the upsetting of a jury verdict by assailing these subjective mental processes. It would also inhibit and restrict the free exchange of ideas during the jury's deliberations.' " (*Mesecher* v. *County of San Diego, supra,* 9 Cal.App.4th at pp. 1683-1684.) The court in *Mesecher* concluded that "Here, the jurors' statements themselves did not constitute misconduct, nor do they reflect an outside influence brought into the courtroom. Rather, the alleged misconduct arose from the way in which the jury interpreted and applied the instructions. Such evidence is inadmissible." (9 Cal.App.4th at p. 1684.)

*Mesecher* has been applied in a case addressing the issue of juror declarations purporting to show how a damage verdict was reached. (*Maxwell* v. *Powers* (1994) 22 Cal.App.4th 1596, 1604-1605 [28 Cal.Rptr.2d 62]; see also *Ferreira* v. *Quik Stop Markets, Inc.* (1983) 141 Cal.App.3d 1023, 1034-1035 [190 Cal.Rptr. 778].) We agree with the instant trial court's implied conclusion, consistent with *Maxwell* and the authorities cited therein, that those portions of Larsen's declaration alleging the conclusions of the jury and the components of the damage award are inadmissible to establish juror misconduct.

As to the alleged improper overt acts, i.e., Foster's remarks about his relative's salary as a commercial artist, we address the issue of whether, assuming such remarks constituted misconduct, such misconduct was prejudicial.

## III

### WHETHER FOSTER'S REMARKS WERE PREJUDICIAL

■ In reviewing the record to independently determine whether the act of jury misconduct, if it occurred, was prejudicial to appellant's right to a fair trial, we consider (1) the strength of the evidence that misconduct occurred, (2) the nature and seriousness of the misconduct, and (3) the probability that actual prejudice may have ensued. (*Young* v. *Brunicardi* (1986) 187 Cal.App.3d 1344, 1348 [232 Cal.Rptr. 588].) In our review of the record, we do not consider those portions of Mr. Larsen's declaration which we have concluded are not admissible to impeach the verdict because they purport to relate only jurors' subjective reasoning processes.

While it is undisputed on this record that Mr. Foster made statements about his relative's salary, there is no explanation as to the context in which the statements were made. Thus, any inference that either Mr. Foster or any other juror deemed such statements to constitute evidence or relied upon them in any fashion in reaching a verdict is extremely weak. Further, the instructions to the jury defining evidence and setting out the nature of their duties render even weaker any inference that misconduct actually occurred.

Moreover, because the statements themselves do not directly relate to any witnesses or parties involved in the case, the misconduct is not serious in the sense of revealing or causing bias against either party. Appellant does not expressly or by implication argue that Foster was biased or that the alleged misconduct was of the nature to create bias in the remaining jurors. Given the lack of context for Foster's statements and the conclusory nature of Larsen's declaration, a claim of bias would be without merit.

As to the probability that actual prejudice may have ensued, we point out that the jury was unanimous on the question of the amount of damages in its special verdict, which does not provide any segregation of the elements of damage.In argument to the jury, plaintiff's counsel asked for specific amounts of damage for past and future medical expenses, past lost earnings, and pain and suffering. Counsel did not seek damages for loss of future earnings as a commercial artist; rather plaintiff's counsel argued that plaintiff lost the ability to have two more years of college and the *degree* he wanted in commercial art. Plaintiff's counsel stated in closing to the jury: "I've never said that Mr. English's life is over. But the life he had planned out for himself and that he had chosen and that he had a realistic shot at doing is over, and that's what we are asking you to compensate him for. . . . This is a realistic injury. Losing the ability to have two more free

years of college. Losing the ability to have the career you wanted in terms of commercial artist, when he needed a four-year degree and had no other means of paying for it but his football abilities. And when every time he played football, he was given awards and notoriety for how well he played, and a guy who played second string behind him went on to play pro, yes, he had a realistic shot at his dream, and that was all taken away."

Although the jury was instructed on the damage element of loss of earning capacity, it was not instructed on the element of loss of future income. Accordingly, in argument to the jury, counsel for English did not ask the jury to award damages for his future loss of earnings as a commercial artist, or as a football player, or for any other occupation. Rather, English argued that he lost earning capacity and was deprived of a four-year college degree in the career of his choice. Foster's remarks have little bearing on this element of damage or any other element of damage as set out in the instructions. Thus, the nature of the alleged misconduct is not serious and posed little potential for prejudice because it was not directly related to a crucial issue in the case. Another factor indicating that it was not reasonably probable that actual prejudice resulted from the misconduct is that the damage award suggested by English's counsel for pain and suffering alone —$600,000—is more than the total damage verdict.

Appellant contends that the misconduct was prejudicial because "the speculative evidence bridged the gap between the evidence English presented at trial concerning his damages and the verdict returned by the jury. English introduced no evidence regarding his loss of future earnings," yet the jury "awarded English $538,000 based largely on its speculation as to English's lost earnings capacity as a commercial artist."

However, there is no evidence that the damage award included damages for loss of earning capacity or future earnings as a commercial artist. "Unfortunately, appellant did not seek a segregation of the elements of damage from the jury, and the jury was not required to do so without such request." (*Enriquez* v. *Smyth* (1985) 173 Cal.App.3d 691, 700 [219 Cal.Rptr. 267].) To the extent that appellant's arguments are premised on a factual assumption that loss of future earnings or earning capacity is a component of the damage award, it is without merit. (*Ibid.*; see also *Sharp* v. *Bragg Crane Service, Inc.* (1985) 168 Cal.App.3d 993, 995-996 [214 Cal.Rptr. 620].)

We also reject appellant's implied assertion that the award must be interpreted to include damages for loss of future earnings as a commercial artist because if comprised only of all other elements of damage, the award would be excessive. Appellant has not established that damage award of

$538,000 comprised, for example, only of pain and suffering, would be excessive or unreasonable. (See *Garfoot* v. *Avila* (1989) 213 Cal.App.3d 1205, 1212 [261 Cal.Rptr. 924].) We also reject, as speculative and not reasonably probable, appellant's contention that the misconduct impacted the liability determinations by the jury.

In light of the entire record in this case, we conclude that there is no reasonable probability of actual harm to appellant resulting from the alleged misconduct. Accordingly, had misconduct occurred, it would not have been prejudicial.

### DISPOSITION

The judgment is affirmed. Respondent is entitled to costs on appeal.

Johnson, J., and Woods (Fred), J., concurred.

Appellant's petition for review by the Supreme Court was denied October 20, 1994.