[No. B009799. Second Dist., Div. Four. Nov. 24, 1987.]

JUDY ELAINE JUTZI, Plaintiff and Appellant, v.
COUNTY OF LOS ANGELES, Defendant and Respondent.

638

COUNSEL

Milton Wasserman for Plaintiff and Appellant.

Greines, Martin, Stein & Richland, Martin Stein and Barbara W. Ravitz for Defendant and Respondent.

OPINION

**GEORGE, J.**—Plaintiff Judy Jutzi sued defendant County of Los Angeles for alleged medical malpractice involving medical services rendered at Los Angeles County USC (University of Southern California) Medical Center.[1] A jury returned a verdict in favor of defendant, and the trial court denied plaintiff's motions for new trial and for judgment notwithstanding the verdict.

 ██ [2.]Plaintiff appeals from the judgment and the denial of her motion for judgment notwithstanding the verdict,[2] contending that (1) the trial court erred in applying to this case Health and Safety Code section 1799.110 (formerly Health & Saf. Code, § 1768), which requires additional qualifications of expert witnesses who testify regarding emergency medical care; (2) the trial court erred in admitting the testimony of certain medical witnesses; (3) defendant's attorney committed misconduct during argument; and (4) a juror committed misconduct during deliberations. For the reasons discussed below, we affirm the judgment and the order denying judgment notwithstanding the verdict.

FACTS

About 10 p.m. on Sunday, December 5, 1976, plaintiff, a 30-year old woman, broke her left ankle in a fall down a flight of stairs. A paramedic ambulance brought her to the emergency room of California Hospital. Her leg was in a cardboard splint, which had been applied by the paramedics. X-rays and a physical examination revealed that the fibula and the tibia were

---

[1] The complaint named additional defendants, including the City of Los Angeles and California Hospital, who for reasons not apparent from the record were not participants in the trial.

[2] Although the notice of appeal also includes the denial of the motion for new trial, this is not an appealable order. (*Fogo* v. *Cutter Laboratories, Inc.* (1977) 68 Cal.App.3d 744, 748-749 [137 Cal.Rptr. 417].) Appellant makes no argument in her appeal relating to the denial of her motion for judgment notwithstanding the verdict, and we therefore consider that portion of the appeal to have been abandoned. (*Rossiter* v. *Benoit* (1979) 88 Cal.App.3d 706, 710 [152 Cal.Rptr. 65].)

fractured in the ankle joint. The fracture was displaced, meaning that instead of being in normal alignment, the bones had come apart and the ankle was deformed.

The emergency room physician at California Hospital determined that plaintiff had good circulation in her left foot and had suffered no other apparent injuries. He gave her a small dose of Demerol, a painkiller, but not considering himself qualified to give orthopedic care, he did not attempt to treat the fracture. Instead, about 2:30 a.m. (four hours after she had arrived at California Hospital), plaintiff was transferred by ambulance to the Los Angeles County USC Medical Center (County Hospital), both because no orthopedist was available at California Hospital and because County Hospital had agreed to provide emergency care for persons who had been brought to California Hospital but were unable to pay for treatment. The cardboard splint may have been removed at California Hospital when plaintiff's leg was X-rayed, "but it was either put back on or kept on," according to the emergency room physician at California Hospital.

Although he was not an orthopedic specialist, and such specialists were available at the hospital, Dr. John Reynolds, an emergency room physician, treated plaintiff when she arrived at County Hospital. On prior occasions Dr. Reynolds had treated between 50 and 60 broken ankles similar to plaintiff's. He observed upon her arrival that her leg was in a cardboard splint. Dr. Reynolds proceeded to administer an anesthetic block and reduce the fracture, meaning that he brought the broken bones back into proper alignment. Dr. Reynolds then applied a full-leg cast. A subsequent X-ray showed that the alignment was good. Dr. Reynolds testified that he applied casts every day he worked in the emergency room.

Dr. Reynolds prescribed Tylenol with Codeine to relieve plaintiff's pain and Valium to calm her nerves. Plaintiff was issued crutches and was released to go home. She was aware that her cast was not a walking cast and that it could not bear weight. She was given an appointment to return in 24 hours to have the cast checked and a second appointment to return one week later. An instruction sheet given to her explained how to care for her leg, warned of the danger signs of complications, and advised her to return to the hospital in the event such complications occurred. After Dr. Reynolds went over the instruction sheet with plaintiff, he felt that she understood it and also understood the use of crutches.

Plaintiff's mother picked her up at the hospital about 9 a.m. Monday and drove her home. She told plaintiff to wait in the vehicle while she went to get help from a neighbor, but plaintiff grew impatient and instead dragged herself unassisted from the vehicle into the house by sitting on the ground

and pushing herself backwards. On Tuesday morning, plaintiff's mother telephoned the hospital and told the woman who answered that she was unable to bring in plaintiff for the 24-hour cast check. In response, plaintiff's mother was told, " 'Well, bring her in when you can.' " Since plaintiff's leg seemed to be all right, her parents did not consider the 24-hour cast check very important. They planned to bring her in for her second appointment a week later unless her condition changed prior to then.

Plaintiff had "a little pain" on Monday, Tuesday and Wednesday but no other problems. On Thursday morning, plaintiff was alone in the house and went into the kitchen, where she slipped and fell. By Thursday night, plaintiff was "in terrible pain." She went to her father in tears and asked him to cut off the cast because it was too tight. He refused, and plaintiff did not seek medical care from Dr. Reynolds or anyone else, although the hospital emergency room was open 24 hours a day.

On Friday morning, plaintiff was still in great pain. Plaintiff's mother noticed that there were blisters on plaintiff's toes and that one of the toes appeared black. When plaintiff's father came home for lunch a couple of hours later, he and plaintiff's mother took plaintiff to County Hospital.

At the hospital it was determined that the circulation in plaintiff's lower leg had been impaired and that damage to the tissues was irreversible. Gangrene developed and 15 days after plaintiff's return to the hospital her left leg was amputated below the knee.

At trial plaintiff's experts testified that Dr. Reynolds should have consulted an orthopedic specialist because plaintiff had a "significant" fracture, although there was no evidence that the fracture was improperly reduced. Instead plaintiff's experts asserted the cast had been made too tight and that it contained a protruding ridge on the inside. The ensuing swelling, which would be anticipated in this type of injury, restricted the circulation in the leg, leading to gangrene. Plaintiff's experts also criticized the decision of Dr. Reynolds to release plaintiff immediately from the hospital instead of keeping her overnight for observation. Plaintiff's experts believed her fall on Thursday morning was not the cause of the complications because the gangrene observed in the hospital the next day could not have developed to that extent in 24 hours.

Defendant's experts believed that the cast was not too tight when initially applied and that the amputation was necessitated by plaintiff's fall and failure immediately after the fall to return to the hospital for treatment. These experts relied on plaintiff's complaint of only minor pain following application of the cast, this being consistent with the normal healing process

for such a fracture. Following the fall, however, her pain increased quickly and dramatically. Defendant's experts concluded that the fall produced additional swelling, which restricted circulation in the leg and led to gangrene. It was the opinion of these experts that, given Dr. Reynolds's training and experience, it was within the standard of care for him to reduce and cast plaintiff's fracture without consulting an orthopedist. They also expressed the opinion that if the cast had been applied improperly at the outset, thus restricting circulation, plaintiff would have been in excruciating pain within hours of leaving the hospital. The defense experts' interpretation of the medical records was that the damage to the leg, although irreversible by Friday, did not yet constitute gangrene and thus could have developed as a result of the Thursday fall.

DISCUSSION

I

THE APPLICABILITY OF HEALTH AND SAFETY CODE SECTION 1799.110, REQUIRING ADDITIONAL QUALIFICATIONS OF EXPERT WITNESSES WHO TESTIFY REGARDING EMERGENCY MEDICAL CARE

Pursuant to Health and Safety Code section 1799.110,[3] the trial court precluded two of plaintiff's expert medical witnesses who did not have recent experience working in a hospital emergency room from testifying that Dr. Reynolds fell below the standard of care in treating plaintiff.[4] Plaintiff contends that the excluded testimony should have been received because Dr. Reynolds's services did not constitute "emergency medical coverage" under the statute, and because the statute applies only to suits against physicians whereas the instant action was brought against the County of Los Angeles. We disagree. As explained below, there was sufficient evidence to support the trial court's implied finding that the treatment of plaintiff constituted "emergency medical coverage." Furthermore, section 1799.110, subdivision (c) applies to any suit involving a claim of negligent

---

[3] This section was numbered Health and Safety Code section 1768 in 1981, the time of the proceedings below. Subdivision (c) of section 1799.110 provides in pertinent part: "In any action for damages involving a claim of negligence against a physician and surgeon providing emergency medical coverage for a general acute care hospital emergency department, the court shall admit expert medical testimony only from physicians and surgeons who have had substantial professional experience within the last five years while assigned to provide emergency medical coverage in a general acute care hospital emergency department."

Hereinafter, all statutory references are to the Health and Safety Code unless otherwise indicated.

[4] One of the other experts called by plaintiff did qualify as an expert in emergency medicine.

emergency treatment by a hospital emergency room physician whether or not that physician is named as a defendant.

### A. The Definition of "Emergency Medical Coverage"

A special requirement, set forth in subdivision (c), must be met before a witness can qualify to testify as a medical expert concerning alleged negligent treatment administered by an emergency room physician. This provision applies only where "emergency medical coverage" is provided. No definition of this term is given, but the apparently synonymous term "emergency medical care" is defined by subdivision (b) of the statute as "those medical services required for the immediate diagnosis and treatment of medical conditions which, if not immediately diagnosed and treated, *could* lead to serious *physical* or mental *disability* or death."[5] (Italics added.)

■ In determining whether a witness is qualified to testify as a medical expert concerning a claim of negligent treatment rendered by an emergency room physician, the trial court must determine as a "preliminary fact" whether the treatment given constituted "emergency medical coverage." (Evid. Code, §§ 400, 405.)[6] This is consistent with the general rule conferring upon the trial court the duty to determine whether a witness qualifies as an expert. (*People* v. *Chavez* (1985) 39 Cal.3d 823, 828 [218 Cal.Rptr. 49, 705 P.2d 372].) ■ Evidence Code section 405 was designed to allow the trial judge to withhold evidence from the jury where the rule mandating its exclusion is based on public policy considerations. (*Fortes* v. *Municipal Court* (1980) 113 Cal.App.3d 704, 710 [170 Cal.Rptr. 292].)

By enacting between 1967 and 1978 the provisions of the Health and Safety Code pertaining to "Emergency Medical Care Services" (§§ 1750-1769.5, presently §§ 1797-1799.106), the Legislature formally declared its "intent . . . to promote the development, accessibility, and provision of emergency medical services to the people of the State of California" and "[f]urther, . . . that people shall be encouraged and trained to assist others at the scene of a medical emergency. . . ." (§ 1750, presently § 1797.5.)

---

[5] The same definition is also given to the phrase "emergency medical services." (§ 1799.110, subd. (b).) For reasons of convenience we refer to the three terms without distinction, as the Legislature appears to have done in drafting the statute. (See also § 1797.70.)

[6] Evidence Code section 400 defines "preliminary fact" as "a fact upon the existence or nonexistence of which depends the admissibility or inadmissibility of evidence. The phrase 'the admissibility or inadmissibility of evidence' includes the qualification or disqualification of a person to be a witness . . . ."

Evidence Code section 405 provides in pertinent part that in the situations covered by this rule, "The court shall determine the existence or nonexistence of the preliminary fact and shall admit or exclude the proffered evidence as required by the rule of law under which the question arises."

With reference to hospital emergency room care, the Legislature mandated that "the trier of fact shall consider, together with all other relevant matters, the circumstances constituting the emergency . . . and the degree of care and skill ordinarily exercised by reputable members of the physician and surgeon's profession in the same or similar locality, in like cases, and *under similar emergency circumstances.*" (§ 1799.110, subd. (a), italics added.) ■ We conclude that the legislative exclusion of expert testimony by physicians who do not have substantial recent experience working in a hospital emergency room is based at least in part on the public policy of encouraging the provision of emergency medical services by insulating the providers of such services from assertions of negligence made by expert witnesses who lack expertise in hospital emergency room care.

■ The trial judge in this case did not make an express finding whether emergency medical care was provided. But the parties vigorously argued this issue, and the trial court's ruling excluding the expert testimony implies a finding that the necessary preliminary fact of emergency medical care did exist. A formal finding is unnecessary. (*LeGrand* v. *Yellow Cab Co.* (1970) 8 Cal.App.3d 125, 132 [87 Cal.Rptr. 292]; Evid. Code, § 402, subd. (c).) (6) The issue before this court, therefore, is whether there was substantial evidence to support the trial court's implied finding. (*Green Trees Enterprises, Inc.* v. *Palm Springs Alpine Estates, Inc.* (1967) 66 Cal.2d 782, 787 [59 Cal.Rptr. 141, 427 P.2d 805].)

A component of emergency medical care is that the patient's condition, "if not immediately diagnosed and treated, *could* lead to serious physical or mental disability or death." (§ 1799.110, subd. (b), italics added.) It is significant, and not inadvertent, that the Legislature used the word "could" rather than "would." Subsequent to the enactment of the statute, an amendment was proposed which would have stricken the word "could" and replaced it with "would." (Sen. Bill No. 734 (1977-1978 Reg. Sess.).) This proposed legislation failed passage, leaving the statute in its present form. (8 Sen.J. (1977-1978 Reg. Sess.) p. 15043.)[7] The significance of this difference is that "would" denotes a certainty that the stated result will follow, while "could" requires only a possibility that serious physical or mental disability or death will result. (See Webster's Third New Internat. Dict. (1981) pp. 323, 2616.)

When plaintiff arrived at County Hospital's emergency room, her leg apparently was in the same cardboard splint which the paramedics had applied at the scene of the accident. The fracture was not treated at Califor-

---

[7]Both sides having requested that we do so, we take judicial notice of the statute's legislative history. (Evid. Code, § 452, subd. (c); *Post* v. *Prati* (1979) 90 Cal.App.3d 626, 633-634 [153 Cal.Rptr. 511].)

nia Hospital; the only treatment administered there was the injection of a small dose of painkiller. At County Hospital Dr. Reynolds had to administer an anesthetic block, move the broken bones back into alignment, and apply a cast.

Viewed in the light most favorable to the trial court's ruling (*People* v. *Henderson* (1977) 19 Cal.3d 86, 97 [137 Cal.Rptr. 1, 560 P.2d 1180]), the testimony of two of plaintiff's experts indicates that when a broken ankle is deformed as was plaintiff's, movement of the broken bone fragments can cause damage to the blood vessels or even sever them, causing internal bleeding and swelling and eventually a possibility of gangrene. This constitutes substantial evidence of the possibility of serious physical disability, supporting the trial court's implied finding that Dr. Reynolds's treatment of plaintiff constituted emergency medical care.

Plaintiff's transfer from California Hospital to County Hospital did not preclude the trial court from properly concluding that the medical services rendered at the latter institution constituted emergency medical care; in enacting section 1799.110 and its predecessor statute, the Legislature contemplated the transfer of emergency care patients among emergency care facilities (see §§ 1798.170, 1798.172, pertaining to guidelines and standards for the transfer of emergency care patients). Nor did the passage of a few hours between plaintiff's arrival at the first hospital, where her ankle went untreated, and her transfer to the second hospital, where the fracture was reduced and a cast applied, obviate the implicit finding that the latter treatment constituted emergency medical care; under the circumstances the situation was no different for purposes of our legal analysis than if plaintiff had spent those hours lying incapacitated at the bottom of the flight of stairs before being discovered and transported by the paramedics to the emergency room of County Hospital.

B. *Applicability of the Statute to Actions Brought Against Hospital Facilities Rather Than Physicians*

Plaintiff also argues that section 1799.110 does not apply where, as here, only the hospital and not the allegedly negligent physician is named as a defendant in the action. Plaintiff draws this conclusion from the initial phrase in subdivision (c): "In any action for damages involving a claim of negligence against a physician and surgeon providing emergency medical coverage . . . ." Plaintiff reads this as limiting the scope of the section to (1) an "action . . . against a physician" "involving a claim of negligence," rather than (2) an "action . . . involving a claim of negligence against a physician."

■ " 'The most fundamental rule of statutory construction is that "the court should ascertain the intent of the Legislature so as to effectuate the purpose of the law." [Citations.] The court first looks to the language of the statute, attempting to give effect to the usual, ordinary import of that language and seeking to avoid making any language mere surplusage. Significance if possible should be attributed to every word, phrase, sentence and part of an act in pursuance of the legislative purpose. [Citation.] "[T]he various parts of a statutory enactment must be harmonized by considering the particular clause or section in the context of the statutory framework as a whole." [Citation.] Further, wherever possible, the statute will be construed in harmony with the Constitution. [Citation.] ■ The provision must be given a reasonable and common sense interpretation consistent with the apparent purpose and intention of the lawmakers, practical rather than technical in nature, and which, when applied, will result in wise policy rather than mischief or absurdity. [Citations.] " 'The court should take into account matters such as context, the object in view, the evils to be remedied, the history of the times and of legislation upon the same subject, public policy, and contemporaneous construction.' " [Citations.]' [Citation.]" (*Fierro* v. *State Bd. of Control* (1987) 191 Cal.App.3d 735, 738-739, fn. 2 [236 Cal.Rptr. 516].)

■ We reject plaintiff's reading of section 1799.110. While not a model of clarity, subdivision (c) appears to refer to actions for damages which involve a claim of negligence against a physician or, in other words, actions which arise from a claim that a physician was negligent in providing emergency medical care. This interpretation has the benefit of hinging application of the section on the relevant consideration of the nature of the claim involved, rather than on the fortuitous circumstance of which particular parties have been named in the suit. It is difficult to assume that the Legislature intended to condition the statutory furtherance of the public policy to which we have alluded on whether or not a plaintiff, for considerations such as amenability to service of process, likelihood of recovery on a judgment, or trial strategy, is willing or able to include a physician among the parties defendant in his medical malpractice suit.[8]

A major purpose behind the enactment of the statute, expressly declared by the Legislature in section 1797.5, would be frustrated by the narrow interpretation urged by plaintiff. Our reading of section 1799.110 is also supported by its legislative history. The description of the statute contained in the Legislative Counsel's Digest of Assembly Bill No. 1301 (1977-1978 Reg. Sess.) follows the statutory language but substitutes the word "by" for

---

[8] At the trial Dr. Reynolds, testifying as a defense witness, stated that he had moved his medical practice to the State of Minnesota.

the word "against": "The bill would require the trier of fact to consider specified matters in actions for damages involving a claim of negligence *by* a physician and surgeon arising out of emergency medical services provided in a general acute care hospital emergency department." (Italics added.) The Legislative Counsel thus construed this language as we do, namely as applying the statute to actions involving a claim of negligence by a physician, but not as limiting its scope to actions against physicians.

Since the clear purpose of section 1799.110 is to encourage the provision of emergency medical care by preventing malpractice claims based on the assertion that an emergency room physician fell below the standard of care which could have been provided by a specialist in the particular field acting under nonemergency conditions, it would have been illogical for the Legislature to seek to achieve that result by shielding the physician from personal liability in certain situations while allowing the hospital or the governmental entity that operates it to be sued under the doctrine of respondeat superior. Just as an emergency room physician might be inhibited by the threat of personal liability from taking quick and decisive action in emergency situations, such inhibition might also result from the knowledge that the physician's employer could be sued and the physician held to have committed malpractice with the attendant consequences to his or her reputation and insurability. Furthermore, just as tort actions against emergency room physicians might persuade them to choose a different area of specialty and decrease the availability of emergency medical care, such suits against hospitals could discourage the operation of emergency care facilities.

For the reasons stated above, we conclude that section 1799.110, subdivision (c) applies to actions for damages involving negligence alleged to have been committed by a hospital emergency room physician providing emergency care, whether or not the physician has been named as a defendant.

## II

### THE ADMISSION OF DEFENSE MEDICAL TESTIMONY CONCERNING THE STANDARD OF CARE AND THE INTERNAL POLICY OF THE HOSPITAL

▉▉▉ Plaintiff contends the trial court erred in allowing Dr. Marshall Morgan, a defense expert witness, to testify that it was proper for Dr. Reynolds to treat the fracture himself instead of summoning an orthopedic specialist. Appellant's opening brief states: "Dr. Morgan was simply testifying based upon his own judgment and not upon his knowledge of the objective standard of care in the community." This misstates the testimony of the expert.

Dr. Morgan testified that it is consistent with the standard of care for an emergency room physician to treat a fracture like plaintiff's if he is qualified to do so by his particular training and experience. Dr. Morgan was careful to explain, however, that he was not suggesting a purely subjective standard in which each physician was the final arbiter of his own competence in a particular area, but rather "that if a person has adequate training and experience so that he *justifiably* feels comfortable in undertaking a procedure, then he should in fact be allowed to do that." (Italics added.) The expert's reliance on the need for the physician to have adequate training and experience, so that he justifiably felt competent, demonstrates that the expert was applying an objective test based on the standards of the medical community.

Plaintiff further argues that Dr. Morgan's testimony should have been excluded because the policy of the hospitals he had worked at was to refer such injuries to an orthopedic specialist. Plaintiff thus argues that Dr. Morgan lacked "the practical and/or occupational experience to qualify him to testify . . . ."

The decision in *Brown* v. *Colm* (1974) 11 Cal.3d 639 [114 Cal.Rptr. 128, 522 P.2d 688] rejected a similar argument that a medical expert was unqualified to testify as to the standard of care prevailing in 1949 because he had not been admitted to practice until several years later. The high court rejected "an invariable rule which would require in all cases that an expert must have acquired a personal, working knowledge of the standard of care at the precise time when the alleged malpractice occurred . . . ." (*Id.,* at p. 644.) ■ In holding that the physician could rely on medical literature to determine the standard of care in existence at a prior time, the high court established a flexible test which takes into account the particular circumstances of each case: "The determinative issue in each case must be whether the witness has sufficient skill or experience in the field so that his testimony would be likely to assist the jury in the search for the truth, and no hard and fast rule can be laid down which would be applicable in every circumstance." (*Id.,* at p. 645; see also *Mann* v. *Cracchiolo* (1985) 38 Cal.3d 18, 37 [210 Cal.Rptr. 762, 694 P.2d 1134].)

■ Dr. Morgan easily met this standard. He was a specialist in emergency medicine, was the acting director of the Emergency Medicine Center at UCLA (University of California at Los Angeles), and had supervised the emergency department at Harbor General Hospital. Dr. Morgan testified that although the policy of the hospitals he had worked at was to refer an injury like the plaintiff's to an orthopedic specialist, this was not the uniform practice throughout the county. Dr. Morgan was aware of the standard of care in the community through professional contacts with other

emergency room specialists, including contacts through his membership in the American College of Emergency Physicians. The trial court's determination that Dr. Morgan was qualified to testify as an expert witness must be upheld absent an abuse of discretion, which will be found only where the evidence shows that a witness clearly lacks qualification as an expert. (*People* v. *Chavez* (1985) 39 Cal.3d 823, 828 [218 Cal.Rptr. 49, 705 P.2d 372].) No such abuse of discretion is shown by the record in this case.

 Plaintiff further argues that the trial court erred in admitting the testimony of Dr. John Grigsby, concerning the policy of County Hospital allowing an injury such as plaintiff's to be treated by an emergency room physician, because Dr. Grigsby had not been designated as an expert witness prior to trial pursuant to Code of Civil Procedure section 2037. Section 2037 does not apply because Dr. Grigsby did not testify as an expert witness. Instead, he testified concerning his *personal* knowledge of the written policy of that hospital in 1976 allowing emergency room physicians to treat fractures of the type in question.

Plaintiff also argues that evidence of this policy should not have been admitted because it was "self-serving" and irrelevant. No authority is cited in support of these arguments. Generally, all evidence introduced by a party is "self-serving" in that it is intended to support that party's position. Certainly the hospital's written policy concerning the types of injuries treatable by its emergency room physicians in 1976 was relevant to the issues before the trier of fact. Moreover, we note that Dr. J. P. Harvey testified concerning the same matter, and had the admission of Dr. Grigsby's testimony been error, it would not have resulted in a miscarriage of justice and thus would not require reversal. (Cal. Const., art. VI, § 13; Code Civ. Proc., § 475.)

## III

### ALLEGED ATTORNEY MISCONDUCT DURING ARGUMENT

 Plaintiff's assertion that defense counsel committed prejudicial misconduct during argument requires only brief discussion. Plaintiff's attorney in opening argument directed the jury's attention to the fact that Dr. Reynolds was not named as a defendant in the suit and then stated: "We're not suggesting that any recriminations be made. There are no recriminations. This is five years later. [¶] The doctor looks in good health; doesn't look like he's been persecuted. He's not going to be. There is nothing involved. The case doesn't even involve him. He's not even a party to the case."

In defense counsel's argument, the following response was made: "Ladies and gentlemen of the jury, this case involves Dr. John T. Reynolds. It is his care and treatment that is being called upon, and which is being reviewed by you. For [plaintiff's attorney] to say that it doesn't involve him is surprising to me. That there is no incrimination, if you should find against him, it is surprising to me."

It is misconduct for an attorney to attempt to appeal to the sympathy of the jury. (*Stone* v. *Foster* (1980) 106 Cal.App.3d 334, 355 [164 Cal.Rptr. 901].) Taken in context, the isolated remarks of defense counsel were within the permissible bounds of argument. They were an appropriate response to plaintiff's argument. Accordingly, we find that no misconduct occurred.

## IV

### ALLEGED JUROR MISCONDUCT

Plaintiff asserts that the trial court erred in denying her motion for new trial on the ground of juror misconduct. The declaration of a fellow juror stated that Juror Dorothy Whitsitt had said more than once that she had been a patient at County Hospital for eight months during her pregnancy, that the hospital's personnel took very good care of her, and that "she couldn't see any wrong that could be done by them." Another juror stated that Ms. Whitsitt said on one occasion, " 'I've been to the County 17 times and they always treated me good.' " Plaintiff argues that this constitutes juror misconduct because Ms. Whitsitt concealed her bias on voir dire and improperly communicated information to fellow jurors from a source outside the evidence in the case. As explained, we find neither contention meritorious.

At the outset of voir dire, the trial judge asked the first 12 jurors whether any of them had ever been hospitalized. Ms. Whitsitt, one of several to respond, stated she had been at County Hospital 18 or 19 years ago during one of her pregnancies, but her experience would not affect her ability to render a fair and impartial verdict. Plaintiff's counsel chose not to examine Ms. Whitsitt on this subject.

Although one of the statements which Ms. Whitsitt may have made would indicate a bias in favor of County Hospital,[9] there is no evidence that Ms. Whitsitt intentionally concealed such a bias on voir dire. On the con-

---

[9] The statement attributed to Ms. Whitsitt by one juror that "she couldn't see any wrong that could be done by them" would reflect a bias in favor of County Hospital. As recalled by another juror, however, the statement was that the hospital had "always treated me good," which would merely relate her own experience and not necessarily reflect a resulting bias.

trary, she willingly revealed her experience as a patient in response to a general question directed to the entire panel. It must be assumed that follow-up questions from counsel further probing her feelings as a result of this experience would have been answered with equal candor.

This court has declined to follow the rule, promulgated in *People* v. *Diaz* (1984) 152 Cal.App.3d 926, 932 [200 Cal.Rptr. 77], that even an inadvertent failure to reveal "a strong potential of juror bias" constitutes misconduct. As we stated in *People* v. *Jackson* (1985) 168 Cal.App.3d 700, 704-705 [214 Cal.Rptr. 346], "It is clear that where a juror intentionally lies on voir dire, such an act constitutes misconduct. . . . But to find misconduct where 'concealment' is unintentional and the result of misunderstanding or forgetfulness is clearly excessive."

Ms. Whitsitt made no attempt to conceal her past involvement with County Hospital. Once her experience was revealed it was the function of plaintiff's attorney to explore the subject if he wished and decide for himself whether a potential for juror bias existed. (*Moore* v. *Preventive Medicine Medical Group, Inc.* (1986) 178 Cal.App.3d 728, 742 [223 Cal.Rptr. 859].) We find no misconduct on the part of the juror. (See *People* v. *Kelly* (1986) 185 Cal.App.3d 118, 126 [229 Cal.Rptr. 584].)

 Plaintiff further argues that Juror Whitsitt committed misconduct by relating her personal experience at County Hospital to other jurors. Plaintiff relies primarily on the decisions in *Smith* v. *Covell* (1980) 100 Cal.App.3d 947 [161 Cal.Rptr. 377] and *Weathers* v. *Kaiser Foundation Hospitals* (1971) 5 Cal.3d 98 [95 Cal.Rptr. 516, 485 P.2d 1132], both of which are distinguishable.

In *Smith* v. *Covell, supra,* 100 Cal.App.3d 947, the plaintiff first complained of lower back pain six weeks after the traffic accident that gave rise to the lawsuit. During deliberations, the foreman told his fellow jurors that he had a back condition and that when his back " 'went out' it 'went out right away' and 'hurt right away.' " (*Id.,* at p. 952.) This constituted juror misconduct because it interjected improper "evidence" in the case on the crucial issue of causation, depriving the plaintiff of any opportunity to respond. (*Id.,* at p. 954.) The situation before us is far different. Ms. Whitsitt's experience as a patient some 18 or 19 years earlier had no direct bearing on a disputed issue of fact. Her information was not current. It involved neither the same doctor who treated plaintiff, nor even the same section of the hospital.

*Weathers* v. *Kaiser Foundation Hospitals, supra,* 5 Cal.3d 98, upon which plaintiff relies, does not lead us to conclude that the trial court erred in

denying the motion for new trial. In *Weathers,* the trial court granted such a motion based on numerous improper acts committed by the jurors, the most innocuous of which was that two jurors stated that Kaiser Hospital was a good hospital. *(Id.,* at p. 107.) Other improprieties included serious transgressions such as a juror telephoning his own physician and obtaining medical advice which he communicated to the jury, indications of racial prejudice, and statements opining that an award of damages to the plaintiff would raise everyone's hospital rates. *(Ibid.)* ▆▆▆ The high court affirmed the ruling of the trial court, stating, " 'it is well settled that the granting of a motion for a new trial rests so completely within the discretion of the trial judge that an appellate court will not interfere with his action unless a manifest and unmistakable abuse of discretion clearly appears. . . .' [Citations.]" *(Id.,* at p. 109.)

▆▆▆ Ms. Whitsitt's conclusion that County Hospital could do no wrong, based on her experience as a patient nearly two decades earlier, pales in comparison to the pattern of misconduct described in *Weathers.* Certainly there is nothing in the *Weathers* opinion suggesting that the belief of the two jurors in that case concerning Kaiser Hospital would have warranted by itself the granting of a motion for new trial in *Weathers.* In any event, the trial court in the instant case exercised its discretion in denying the motion for new trial. Based on the deference to be accorded such rulings under the holding in *Weathers,* we do not find that the trial court abused its discretion.

### DISPOSITION

The judgment and order denying judgment notwithstanding the verdict are affirmed.

Kingsley, Acting P. J., and McClosky, J., concurred.

Appellant's petition for review by the Supreme Court was denied February 25, 1988.