Filed 1/2/25

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| CHARLIE L., a Minor, etc.,<br><br>     Plaintiff and Appellant,<br><br>     v.<br><br>PEYMAN KANGAVARI, M.D.,<br><br>     Defendant and<br>Respondent. | B327714<br><br>(Los Angeles County<br>Super. Ct. No.<br>21STCV15446) |

     APPEAL from a judgment of the Superior Court of Los Angeles County, Olivia Rosales, Judge.  Reversed and remanded.

     Law Offices of Michels & Lew, Steven B. Stevens, Philip Michels and Jin N. Lew for Plaintiff and Appellant.

     Horvitz & Levy, H. Thomas Watson and Peder K. Batalden; Dummit, Buchholz & Trapp, Scott D. Buchholz, Pari H. Granum, and Nicole G. Wells for Defendant and Respondent.

Cole Pedroza, Curtis A. Cole and Cassidy Davenport for California Medical Association, California Dental Association, and California Hospital Association as Amicus Curiae on behalf of Defendant and Respondent.

\* \* \* \* \* \*

To grant physicians and surgeons in general acute care hospital emergency departments a measure of protection from malpractice claims—and thereby to encourage the provision of such emergency medical care—our Legislature enacted what is now Health and Safety Code section 1799.110.[1] (*Petrou v. South Coast Emergency Group* (2004) 119 Cal.App.4th 1090, 1094 (*Petrou*)); *Jutzi v. County of Los Angeles* (1987) 196 Cal.App.3d 637, 648 (*Jutzi*).)  The statute accomplishes its purpose in two ways—namely, (1) by modifying the standard of care applicable in malpractice cases to account for the "unique challenges and demands of an emergency room" (*Stokes v. Baker* (2019) 35 Cal.App.5th 946, 948 (*Stokes*); § 1799.110, subd. (a)), and (2) by increasing the qualifications an expert must possess before testifying as to whether that altered standard of care was violated in any given case (§ 1799.110, subd. (c)).  This case presents the question:  Does section 1799.110's stricter qualifications requirement for expert witnesses apply when the physician being sued was an on-call radiologist who remotely reviewed X-ray and ultrasound images for an emergency department patient on a "stat" basis as requested by the emergency department?  We hold that it does, and thus respectfully disagree with *Miranda v. National Emergency*

---

[1]     All further statutory references are to the Health and Safety Code unless otherwise indicated.

*Services, Inc.* (1995) 35 Cal.App.4th 894, 903-904 (*Miranda*).  The trial court here correctly ruled that section 1799.110 applies to the malpractice claims against the on-call radiologist, but incorrectly granted summary judgment after finding the defendant-radiologist's expert was qualified under that statue but the plaintiff-patient's expert was not.  Because we conclude that *neither* expert was shown to meet the more stringent test for qualification when the evidence is viewed through the lens applicable on summary judgment, we reverse the judgment for the defendant-physician.

FACTS AND PROCEDURAL BACKGROUND

## I.    Facts

At 2:07 a.m. on October 11, 2020, three-year-old Charlie L. (plaintiff) was brought by his mother to the emergency department at PIH Health Hospital-Whittier for abdominal pain.  Plaintiff had been in and out of hospitals for conditions related to a malrotated bowel he had at birth, for which he had endured several corrective surgeries as well as prior emergency department visits for incidents of vomiting and constipation.

At around 3:00 a.m., the emergency department physician treating plaintiff issued "stat" orders for an X-ray and ultrasound of plaintiff's abdomen.  The images were sent for evaluation to Peymam Kangavari, M.D., an "on-call radiologist" working remotely.

The X-ray was taken at 3:12 a.m. and Kangavari issued a report based on the images at 3:51 a.m.  The ultrasound was taken at 3:24 a.m. and Kangavari issued another report based on those images at 4:35 a.m.  Both reports concluded that plaintiff's bowel was unobstructed.  Based on Kangavari's reports of the imaging results as well as other examinations of plaintiff by

3

emergency department staff, plaintiff was discharged home at 5:54 a.m. with instructions to follow up with his pediatrician and gastroenterologist.

Soon after returning home, plaintiff vomited and turned blue. His parents brought him back to the emergency department at 8:18 a.m., nonresponsive with a faint pulse and not breathing. Plaintiff was transferred to Children's Hospital Orange County later that morning, where he underwent multiple surgeries over the next three days to remove necrotic tissue and the majority of his small bowel due to a lack of blood flow caused by a bowel obstruction.

Plaintiff now suffers "short gut syndrome," has to be fed with a G-tube, wears diapers at all times, and struggles with speech and other mental and emotional capabilities.

## II. Procedural Background

Plaintiff, by and through his mother acting as his guardian ad litem, filed a negligence action against Kangavari on April 23, 2021.[2] Plaintiff alleges that Kangavari committed medical malpractice by failing to timely diagnose his bowel obstruction, and alleges that malpractice caused his injuries.

Kangavari moved for summary judgment on the grounds that the undisputed facts showed that he adhered to the standard of care (and hence was not negligent), and that any negligence did not cause plaintiff's injuries. In support of his motion,

---

[2]     Plaintiff named other defendants—specifically, PIH Health, Inc., Presbyterian Health Physicians, the hospital, the emergency department physician, and the emergency department physician's assistant—but plaintiff's claims against those parties are not at issue on appeal.

4

Kangavari provided the declaration of a diagnostic radiologist, John Lieu, M.D.

Plaintiff opposed the motion. In support of his opposition, he provided the declaration of a medical school professor of clinical radiology, Ravi Srinivasa, M.D.

During protracted litigation over whether Kangavari could depose plaintiff's expert in the midst of briefing on the summary judgment motion, Kangavari asserted for the first time that plaintiff's expert did not meet the qualifications set forth in section 1799.110, which requires experts testifying in certain negligence cases to have specific and "substantial professional experience" in an emergency department.[3] Kangavari never deposed the expert, but plaintiff's expert still filed a supplemental declaration attempting to establish that he had the requisite qualifications. Following a reply brief by Kangavari, objections and responses regarding the admissibility of plaintiff's expert's opinion under section 1799.110, and a hearing at which plaintiff objected that Kangavari's expert also did not meet the qualifications required by the statute, the trial court granted summary judgment for Kangavari.[4]

---

[3] The trial court initially continued the summary judgment hearing so Kangavari could depose plaintiff's expert prior to filing his reply brief and, if Kangavari presented any deposition testimony in that reply, the court also granted plaintiff permission to file a sur-reply. Plaintiff then moved to quash the notice of deposition of his expert, and Kangavari argued in opposition, among other things, that the expert lacked the requisite experience to provide a standard of care opinion against an emergency department physician.

[4] The parties spill much ink debating the propriety of plaintiff's supplemental expert declaration, the timeliness of

5

The court (1) ruled that section 1799.110 applies to the malpractice claims against Kangavari; (2) implicitly overruled plaintiff's objection to Kangavari's expert's qualifications under section 1799.110; (3) expressly sustained Kangavari's objection to plaintiff's expert's qualifications under section 1799.110; and (4) ruled that plaintiff's failure to oppose the motion with expert testimony warranted the grant of summary judgment.

After judgment was entered for Kangavari, plaintiff timely appealed.

## DISCUSSION

Plaintiff argues that the trial court erred in granting summary judgment for Kangavari because (1) section 1799.110's qualifications requirement for expert witnesses does not apply to this case in the first place, and (2) even if the statute applies, either (a) *both* parties' experts met the requirement (such that there was admissible and conflicting expert testimony on the standard of care, thereby precluding summary judgment, Code. Civ. Proc., § 437c, subds. (a), (c), (o), (p)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, 853 (*Aguilar*)) or (b) *neither* of them did (such that Kangavari did not carry his threshold burden of negating an element of plaintiff's claim, thereby precluding summary judgment (e.g., *McAlpine v. Norman* (2020) 51 Cal.App.5th 933, 939; *Hanson v. Grode* (1999) 76 Cal.App.4th 601, 606-607)).

This appeal therefore presents two questions.

First, does section 1799.110's stiffer expert witness qualifications requirement apply in a malpractice lawsuit against

_____

Kangavari's reply brief, and the validity of plaintiff's mid-hearing objection.  Like the trial court, we have opted to consider the entirety of the parties' filings in the trial court.

6

a physician who remotely reviews test results on a "stat" basis as part of the emergency department?

Second, and if the answer to the first question is "yes," do the parties' respective experts in this case satisfy that qualifications requirement?

The first question is one of statutory interpretation that we review de novo. (*Adolph v. Uber Technologies, Inc.* (2023) 14 Cal.5th 1104, 1120.) The second question, because it arises in the context of summary judgment and entails the application of the law to undisputed facts, is also one we review de novo. (*Samara v. Matar* (2018) 5 Cal.5th 322, 338 [summary judgment]; *Guardianship of Saul H.* (2022) 13 Cal.5th 827, 846.)

## I.    Does Section 1799.110 Apply to Physicians Who Review Test Results as Part of an Emergency Department Treating an Emergency Department Patient?

In a typical medical malpractice lawsuit, the applicable standard of care by which a defendant-physician is adjudged is the "reasonable degree of skill, knowledge, and care ordinarily possessed and exercised by members of the medical profession under similar circumstances." (*Bardessono v. Michels* (1970) 3 Cal.3d 780, 788; *Burgess v. Superior Court* (1992) 2 Cal.4th 1064, 1081.) And in such a lawsuit, the parties may offer expert opinions on the standard of care as long as any proffered expert "has special knowledge, skill, experience, training, or education" that renders the expert familiar with conditions similar to those at issue in the case. (Evid. Code, § 720, subd. (a); *Avivi v. Centro Medico Urgente Medical Center* (2008) 159 Cal.App.4th 463, 470-471; *Borrayo v. Avery* (2016) 2 Cal.App.5th 304, 310-311 (*Borrayo*).)

Section 1799.110 alters these defaults in two ways.

7

First, section 1799.110 relaxes the applicable standard of care "[i]n any action for damages involving a claim of negligence against a physician and surgeon arising out of *emergency medical services* provided in a general acute care hospital emergency department." (§ 1799.110, subd. (a), italics added.) For these purposes, "emergency medical services" are defined as "those medical services required for the immediate diagnosis and treatment of medical conditions which, if not immediately diagnosed and treated, could lead to serious physical or mental disability or death." (*Id.*, subd. (b).) Section 1799.110 requires the standard of care applicable in this context to "consider, together with all other relevant matters," (1) "the circumstances constituting the emergency" and (2) "the degree of care and skill ordinarily exercised by reputable members of the physician and surgeon's profession [(a)] in the same or similar locality, [(b)] in like cases, and [(c)] under similar emergency circumstances." (*Id.*, subd. (a).)

Second, section 1799.110 stiffens the medical qualifications required for experts who seek to opine on whether the modified standard of care has been met "[i]n any action for damages involving a claim of negligence against a physician and surgeon providing *emergency medical coverage* for a general acute care hospital emergency department." (§ 1799.110, subd. (c), italics added; *Stokes*, *supra*, 35 Cal.App.5th at pp. 950, 966 [limiting the reach of this provision to expert testimony on the standard of care, but not testimony regarding causation or damages].) The statute permits expert testimony in this context "only from physicians and surgeons who have had substantial professional experience within the last five years while assigned to provide emergency medical coverage in a general acute care hospital

8

emergency department." (§ 1799.110, subd. (c); *Petrou, supra*, 119 Cal.App.4th at pp. 1094-1095 [expert's experience must be within five years of *alleged malpractice*, not five years of testimony].)[5] Section 1799.110 does not define "emergency medical coverage."

The question presented in this appeal is whether section 1799.110's qualifications requirement for expert witnesses applies in malpractice actions against physicians who remotely provide medical expertise on an expedited basis as part of an emergency department in the midst of treating an emergency department patient.

We hold that it does. In our view, this is the only conclusion consonant with section 1799.110's purpose.

When interpretating a statute, "our fundamental task" "is to ascertain and effectuate [its] intended legislative purpose." (*Los Angeles Metropolitan Transportation Authority v. Alameda Produce Market, LLC* (2011) 52 Cal.4th 1100, 1107; *United Riggers & Erectors, Inc. v. Coast Iron & Steel Co.* (2018) 4 Cal.5th 1082, 1089.) Although the statute's text "typically is the best and most reliable indicator of the Legislature's intended purpose" (*Larkin v. Workers' Comp. Appeals Bd.* (2015) 62 Cal.4th 152, 157), that text "may be disregarded to avoid absurd results or to give effect to manifest purposes that . . . appear from its provisions . . . as a whole" (*Silver v. Brown* (1966) 63 Cal.2d 841,

---

[5] The statute goes on to define "substantial professional experience" as being "determined by the custom and practice of the manner in which emergency medical coverage is provided in general acute care hospital emergency departments in the same or similar localities where the alleged negligence occurred." (§ 1799.110, subd. (c).)

9

845 (*Silver*); *Webster v. Superior Court* (1988) 46 Cal.3d 338, 344). In other words, a statute's purpose is paramount.

Although the text of section 1799.110 is "not a model of clarity" (*Jutzi, supra*, 196 Cal.App.3d at p. 650), our Legislature's purpose in enacting that statute was crystal clear. What is now section 1799.110 was enacted in 1978 to "promote 'the development, accessibility and provision of emergency medical services to the People of the State of California.'" (*James v. St. Elizabeth Community Hospital* (1994) 30 Cal.App.4th 73, 80-81 (*James*), quoting Stats. 1978, ch. 130, § 2, p. 342.) As the bill's author explained, "emergency room care" has "unique characteristics"—chiefly, that "[e]mergency physicians must make instantaneous decisions on the diagnosis and treatment of emergency patients" without the benefit of time to "review [the patient's] past medical history, seek a consultation, study current medical literature, [or] reflect upon the proper diagnosis and course of treatment." (*Stokes, supra*, 35 Cal.App.5th at pp. 962-963.) Yet emergency department physicians sued for malpractice were, at that time, being held to the same standard of care applicable to physicians acting "in the relaxed office confines of a private practitioner"—and through the testimony of expert witnesses who had no familiarity with the very different "realities" of emergency department care. (*Id.* at p. 959; *James*, at p. 81.) The Legislature not only "perceiv[ed]" this Monday morning quarterbacking to be "unfair[]," but saw that it was driving up the cost of malpractice insurance for emergency department physicians and thereby discouraging physicians from taking such posts—and, critically, reducing the availability of emergency department services to the detriment of the public at large. (*Stokes*, at pp. 964-965; *Jutzi, supra*, 196 Cal.App.3d at p.

10

651.)  To counteract this perceived unfairness, section 1799.110 requires emergency department physicians to be held to a standard of care that accounts for "similar emergency circumstances" (§ 1799.110, subd. (a)), and requires expert testimony applying that standard of care to come only from "physicians . . . who have had substantial professional experience within the last five years while assigned to provide emergency medical coverage in a general acute care hospital emergency department" (*id.*, subd. (c)).

Given this undisputed purpose, section 1799.110's strictures apply to physicians who remotely provide their medical expertise as part of an emergency department that is treating a patient of that department.  Such physicians are under the same time pressures as any other physician providing emergency medical services; like their in-person counterparts formally assigned to an emergency department, such physicians also lack the time to review the patient's more fulsome medical history, to conduct research, or to reflect.  And they face the same threat of malpractice liability that drives up insurance rates and concomitantly drives physicians away from taking such posts. Indeed, plaintiff's expert frankly acknowledges that "diagnostic radiologists" like Kangavari "rarely need[] to work in the emergency department itself."  Carving such on-call or specialist physicians out of section 1799.110's ambit would not "give effect to [the] manifest purpose[ of section 1799.110] that . . . appear[s] from its provisions . . . as a whole."  (*Silver*, *supra*, 63 Cal.2d at p. 845.)

Plaintiff resists this conclusion with what boils down to two categories of arguments.

11

First, plaintiff argues that the *text* of section 1799.110 precludes the application of the statute's stiffer expert witness qualifications requirement in cases where an on-call or specialist physician is being sued for malpractice.  Plaintiff starts with the following syllogism—namely, (1) subdivision (c)'s more stringent test for qualifying experts applies, by its plain terms, only "[i]n an[] action for damages involving a claim of negligence against a physician . . . *providing emergency medical coverage* for a general acute care hospital emergency department" (§ 1799.110, subd. (c), italics added); (2) subdivision (a)'s test for applying a more relaxed standard of care applies, by its plain terms, only "[i]n an[] action for damages involving a claim of negligence against a physician . . . *arising out of emergency medical services* provided in a general acute care hospital emergency department" (*id.*, subd. (a), italics added); (3) different wording in the same statute presumptively indicates different meanings (*Ferra v. Loews Hollywood Hotel, LLC* (2021) 11 Cal.5th 858, 872 (*Ferra*)); and (4) cases have interpreted "emergency medical *coverage*" to be broader than "emergency medical *services*" (*James*, *supra*, 30 Cal.App.4th at pp. 79-80 ["the term 'emergency medical coverage' is broader than the term 'emergency medical services'"]; *Zavala v. Board of Trustees* (1993) 16 Cal.App.4th 1755, 1762-1763 (*Zavala*) [same]; but see *Jutzi*, *supra*, 196 Cal.App.3d at p. 647 [equating the two terms]), so that (5) just because an on-call or specialist physician is providing "emergency medical *services*" triggering the relaxed standard of care does not necessarily mean they are providing "emergency medical *coverage*" triggering the stiffer expert qualifications requirement.  Plaintiff goes on to note that subdivision (c)'s more stringent test for qualifying an expert requires the expert to have "substantial professional experience

12

within the last five years *while assigned* to provide emergency medical coverage" in an emergency department. (§ 1799.110, subd. (c), italics added.) If the *expert* is required to be *assigned* to an emergency department before they may opine on whether the physician being sued met the relaxed standard of care, plaintiff reasons, then *the physician being sued* should also be required to be assigned to an emergency department before they can get the advantage of the stiffer expert qualifications requirement.

We reject these text-based arguments.[6]

---

[6] In response to the amici's brief, plaintiff cites section 1317, which grants "members of [a licensed health facility's] rescue *team*," who are specially "trained in cardiopulmonary resuscitation," immunity from liability occurring "while attempting to resuscitate a person who is in immediate danger of loss of life" as long as they "exercise[]" "good faith." (§ 1317, subds. (g) & (h), italics added.) Because the Legislature knows how to use the word "team" in some statutes, plaintiff reasons, its failure to do so in section 1799.110, subdivision (c) means that section only reaches physicians who are assigned to, and physically present in, an emergency department. Plaintiff's conclusion does not flow from his premise. To begin, section 1317 is on its face inapplicable here, as it addresses the standard of care applicable to a different (and much smaller) subset of physicians operating under the emergency condition of attempting to resuscitate a patient. If anything, section 1317 *supports* our reading of section 1799.110. Anyone helping to resuscitate a person is *necessarily* physically present, so the Legislature's use of the word "team" in section 1317 and its omission from section 1799.110, subdivision (c) suggests that the breadth of the latter was meant to turn—not on physical presence—but instead on its specific text and its purpose, which we have concluded reach on-call specialists working under emergency conditions with physicians physically present in the emergency department.

13

To begin, and most fundamentally, we reject these arguments because they would have us read the text of section 1799.110 in a manner that would deny the benefits of the statute to on-call and specialist physicians who are part of the core universe of persons the statute was meant to aid—namely, physicians who are operating under the time pressures of the emergency department. To be sure, the Legislature used the phrase "providing emergency medical *coverage*" to define when section 1799.110's stiffer expert qualifications requirement kicks in while using the different "arising out of emergency medical *services*" phrase to define when the statute's relaxed standard of care applies. But the canon of statutory construction that generally obligates courts to ascribe different meanings to different phraseology is just that—a canon of construction that "yield[s]" to the otherwise "abundantly clear" "purpose" of the statute. (*Rutgard v. City of Los Angeles* (2020) 52 Cal.App.5th 815, 827-828; accord, *Ferra*, 11 Cal.5th at p. 872 [this canon is not an "immutable rule[]"].) The court in *James* drew a distinction between "emergency medical coverage" and "emergency medical services," but did so to extend section 1179.110, subdivision (c)'s expert qualifications requirement to an emergency department physician treating an emergency department patient who did not end up needing emergency medical services. (*James*, *supra*, 30 Cal.App.4th at pp. 81-82.)[7] The court construed "emergency medical coverage" more broadly than "emergency medical services," in recognition of the fact that emergency department

[7] The case that first drew a distinction between "emergency medical coverage" and "emergency medical services" was *Zavala*, *supra*, 16 Cal.App.4th 1755, but it was undisputed that the doctor in *Zavala* was providing both. (*Id.* at p. 1763.)

14

physicians who "cover[]" the emergency department—whether or not they end up providing "emergency medical services"—are subject to the same mandatory obligation to treat, the same time pressures, and the same obligation to be "ultimate 'generalist[s],'" regardless of the type of care they ultimately provide. (*Ibid.*) In other words, *James* construed the two phrases differently in a manner that *furthered* section 1799.110's purpose. *James*'s holding that the term "emergency medical coverage" is *broader* than "emergency medical services" does not mandate that we construe "emergency medical coverage" to be *narrower* than—and thus to exclude from its reach—the "emergency medical services" undeniably provided by physicians on-call or consulting to the emergency department. To do so would be inconsistent with the purpose of section 1799.110.

Plaintiff's further reliance on the language in subdivision (c) of section 1799.110 that the *expert* be "assigned" to an emergency department adds nothing. As a threshold matter, we do not see how the statute's specification regarding the experience the expert must have should the more stringent qualifications requirement be triggered somehow alters *the trigger itself*. But even if it did, the fact remains that section 1779.110's purposes of avoiding Monday morning quarterbacking and thereby ensuring an adequate supply of emergency department physicians applies whenever a physician is providing emergency medical services—regardless of the physician's formal assignment. To hold otherwise is to give controlling weight to a hospital's "org chart." Nothing in section 1799.110 evinces such an intent. Either viewed separately or together, plaintiff's textual arguments lead to what we view as a further absurd result. Plaintiff seems to concede that on-call or specialist

15

physicians who provide emergency medical services are entitled to application of the relaxed standard of care under subdivision (a) of section 1799.110.  Yet, those same physicians—because they are not, under plaintiff's view, providing "emergency medical *coverage*"—can be found liable for malpractice based on the testimony of expert witnesses who lack any personal experience with emergency department practice.  This seems absurd, given that section 1799.110's purpose is to ensure that the experts opining on whether a particular physician meets a standard of care have *some* personal experience with that standard.

Second, plaintiff argues that the legislative history leading up to the enactment of what is now section 1799.110 dictates that on-call or specialist physicians be deemed to be outside its ambit.  A statute's legislative history can be a helpful tool in ascertaining its meaning.  (*Smith v. LoanMe, Inc.* (2021) 11 Cal.5th 183, 190.)  Here, plaintiff notes that the bill that gave rise to what is now section 1799.110 initially contained a second provision that applied to "physician specialists and other physicians . . . assist[ing] emergency physicians," and that second provision was ultimately deleted before the bill was enacted; thus, plaintiff reasons, we must give effect to that deletion by excluding on-call physicians like Kangavari from the ambit of section 1799.110.  (E.g., *Central Delta Water Agency v. State Water Resources Control Bd.* (1993) 17 Cal.App.4th 621, 634 ["The fact that the Legislature chose to omit a provision from the final version of a statute which was included in an earlier version constitutes strong evidence that the [statute] as adopted should not be construed to incorporate the original provision"].)

We reject this legislative history-based argument as well.  To begin, plaintiff ignores *the reason* why the provision affecting

16

on-call and specialist physicians was deleted.  It was deleted—not based on an explicit desire to subject on-call or specialist physicians for the emergency department to the same standards as all other physicians—but instead on the premise that those physicians were otherwise already given extra protection from liability by certain Good Samaritan laws with which section 1799.110 potentially "overlap[ped]."  Moreover, and even if we ignored the purported reason for the deletion, the fact remains that denying on-call or specialist physicians the protection of section 1799.110 when they are providing expertise on behalf of the emergency department is inconsistent with the statute's purpose, which the bill's author elsewhere in the legislative history noted was meant to protect those who provide "emergency medical *services*"—which on-call and specialist physicians undeniably do when treating an emergency department patient. (*Stokes*, *supra*, 35 Cal.App.5th at p. 964, italics added, quoting Assemblyperson Vic Fazio, letter to Assembly Speaker Leo T. McCarthy (Aug. 31, 1978) 10 Assem. J. (1977-1978 Reg. Sess.) p. 18447.)  If a statute's unambiguous *text* must yield to its purpose, so must its ambiguous legislative history.

   This analysis puts us at odds with the decision in *Miranda*, *supra*, 35 Cal.App.4th 894.  *Miranda* held that section 1799.110's more stringent test for qualifying an expert witness did not apply in malpractice lawsuits against physicians providing emergency medical services on an on-call or consulting basis because those emergency medical services did not constitute "emergency medical coverage." (*Id.* at pp. 900-907.)  In reaching this conclusion, *Miranda* relied upon the textual and legislative history arguments pressed by plaintiff in this case. (*Id.* at pp. 900-905.)  *Miranda* found the text of section 1799.110 to be

17

"uncertain" (*id.* at p. 902), and rested its holding chiefly on the deletion from the initial bill of the language protecting on-call or specialist physicians (*id.* at pp. 903-904). However, *Miranda* did not discuss the *reason* for that deletion or otherwise confront how exclusion of on-call or specialist physicians from the ambit of section 1799.110 would *discourage* physicians from working in emergency departments—a result inimical to the undisputed purpose of the statute. Because we find *Miranda*'s reasoning flawed, we respectfully reject its holding as well.

## II. Do the Parties' Experts Satisfy the Qualifications Requirement for Expert Witnesses in Section 1799.110?

Because plaintiff does not dispute that Kangavari was providing emergency medical services on an on-call and "stat" basis—and because we have concluded that this qualifies as providing emergency medical coverage—section 1799.110's stiffer expert witness qualifications requirement applies. Thus, the parties' experts may offer testimony only if they "have had substantial professional experience" "provid[ing] emergency medical coverage" in the emergency department during the five years preceding plaintiff's injury. (§ 1799.110, subd. (c).)

Although the admission of expert testimony is generally reviewed for an abuse of discretion (*People v. McDowell* (2012) 54 Cal.4th 395, 426), and although the question of whether an expert meets section 1799.110's qualification standard is a preliminary fact generally reviewed for substantial evidence (*Sigala v. Goldfarb* (1990) 222 Cal.App.3d 1450, 1454; *Jutzi*, *supra*, 196 Cal.App.3d at p. 647; see generally *People v. Bolin* (1998) 18 Cal.4th 297, 321-322; Evid. Code, § 402), here each expert's qualifications are undisputed and the question thus becomes one we review de novo (*Boling v. Public Employment*

*Relations Bd.* (2018) 5 Cal.5th 898, 912). The proponent of each expert bears the burden of establishing its expert's qualifications. (*Zavala, supra,* 16 Cal.App.4th at p. 1763; accord, Code Civ. Proc., § 437c, subd. (d) ["Supporting and opposing affidavits or declarations [proffered in summary judgment proceedings] . . . shall show affirmatively that the affiant is competent to testify to the matters stated in the affidavits or declarations"].)

### A. *Kangavari's expert*

Kangavari's proffered expert was Dr. Lieu.

Dr. Lieu declared that he has been a practicing Board-certified diagnostic radiologist "for the past 13 years," "interpreting imaging studies for pediatric and adult patients throughout the hospital setting, including the Emergency Department." However, Dr. Lieu does not elsewhere in his declaration (nor in his curriculum vitae) specify his professional experience working under emergency conditions, identify the unique challenges facing a radiologist serving the emergency department, or key his opinion to the standard of care applicable under emergency circumstances specifically.

Because Dr. Lieu's declaration is being submitted by Kangavari—who is the party moving for summary judgment—we may not pave over the gaps in Dr. Lieu's experience by reasonably inferring that the "interpret[ations]" he did for "Emergency Department[s]" were for patients awaiting emergency medical services in those departments. (E.g., *Kulesa v. Castleberry* (1996) 47 Cal.App.4th 103, 111 [summary judgment "papers are to be construed strictly against the moving party"].) Because the party moving for summary judgment in a medical malpractice case bears the burden of establishing his compliance with the pertinent standard of care through the use of

expert testimony (*Powell v. Kleinman* (2007) 151 Cal.App.4th 112, 123 [expert declaration required for moving party in a medical malpractice case]; *Borrayo*, *supra*, 2 Cal.App.5th at p. 310 [same]; *Munro v. Regents of University of California* (1989) 215 Cal.App.3d 977, 984-985 [same]; see generally Code Civ. Proc., § 437c, subds. (o) & (p)(2) [party moving for summary judgment has initial burden to negate an element of plaintiff's claim]),[8] the trial court erred in finding Kangavari met his burden when it granted his motion.

### B. *Plaintiff's expert*

Plaintiff's expert was Dr. Srinivasa.

In his initial declaration, Dr. Srinivasa stated only that he had been a Board-certified interventional radiologist for the past 10 years and works as an associate professor of clinical radiology at a medical school; he mentioned no professional experience in an emergency department. In his supplemental declaration submitted after Kangavari raised a section 1799.110-based objection, Dr. Srinivasa stated that he "worked in the emergency department[] reading diagnostic studies" during his employ at the University of Texas in Houston from 2012-2015 and that his work as "Director of Mott Children's Hospital Pediatric Interventional Radiology program" from 2016 to 2018 "included regularly reviewing images of pediatric emergency patients for diagnosis and for interventional treatment." Dr. Srinivasa also declared more generally that his "work" as a professor and

---

8 While we could reverse the judgment based on this error alone regardless of what evidence plaintiff submitted in opposition to the summary judgment motion, we will evaluate section 1799.110's qualifications requirement as to plaintiff's expert as well.

interventional radiologist requires him to "regularly . . . read and interpret images of emergency department patients." However, Dr. Srinivasa does not in his declaration (nor in his curriculum vittae) specify that his work in emergency departments reading diagnostic studies or reviewing images indicate that he undertook these tasks while working under emergency conditions. To the contrary, the professional experiences Dr. Srinivasa highlighted as involving review of emergency department patients' images are listed on his curriculum vitae as "academic" and "administrative" experience.

Even though Dr. Srinivasa's declaration was submitted by plaintiff in opposition to the summary judgment motion, and is thus subject to the rule obligating us to "liberally construe[]" his declaration (*Saelzer v. Advanced Group 400* (2001) 25 Cal.4th 763, 768; *Miller v. Bechtel Corp.* (1983) 33 Cal.3d 868, 874; *Aguilar*, *supra*, 25 Cal.4th at p. 843), that rule of construction does not empower us to pave over the critical gap in Dr. Srinivasa's declaration by reasonably inferring that the academic-based work he did was in the course of *emergency* treatment. (See Code Civ. Proc., § 437c, subd. (d) [requiring "affirmative[]" "show[ing]' of a declarant's "competen[ce] to testify"].) Thus, Dr. Srinivas's declaration is also inadmissible under section 1179.110, subdivision (c).

## DISPOSITION

The judgment is reversed. Plaintiff is entitled to his costs on appeal.

## **CERTIFIED FOR PUBLICATION**.

21

_____, J.*
HOFFSTADT

We concur:


_____, P. J.
LUI


_____, J.
ASHMANN-GERST

---

* Justice of the Court of Appeal, Second Appellate District, Division Five, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.